98TH CONGRESS
*2d Session*

HOUSE OF REPRESENTATIVES

REPT. 98-432
Part 2

# TAX REFORM ACT OF 1984

MARCH 5, 1984.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. ROSTENKOWSKI, from the Committee on Ways and Means, submitted the following

## SUPPLEMENTAL REPORT

[To accompany H.R. 4170]

[Including cost estimate of the Congressional Budget Office]

The Committee on Ways and Means, to whom was referred the bill (H.R. 4170) to provide for tax reform, and for other purposes, having considered the same, report favorably thereon with an amendment and recommend that the bill as further amended do pass.

The amendment is as follows:

31-409 O

MARCH 5, 1984

---

**[Amendment in the Nature of a Substitute to H.R. 4170, Including an Amendment to the Amendment in the Nature of a Substitute Set Forth as Section 1006]**

Strike out all after the enacting clause and insert in lieu thereof the following:

**SECTION 1. SHORT TITLE; ETC.**

(a) SHORT TITLE.—This Act may be cited as the "Tax Reform Act of 1984".

(b) AMENDMENT OF 1954 CODE.—Except as otherwise expressly provided, whenever in this Act an amendment or repeal is expressed in terms of an amendment to, or repeal of, a section or other provision, the reference shall be considered to be made to a section or other provision of the Internal Revenue Code of 1954.

(c) TABLE OF TITLES.—

Title I. Tax Freeze; Tax Reforms Generally.
Title II. Life Insurance Provisions.
Title III. Revision of Private Foundation Provisions.
Title IV. Tax Simplification.

Title V Tax Treatment of Fringe Benefits
Title VI Technical Corrections
Title VII Tax-Exempt Bond Provisions
Title VIII Miscellaneous Revenue Matters
Title IX Social Security Disability Benefits Reform
Title X Medicare Budget Reconciliation Amendments
Title XI Trade Adjustment Assistance
Title XII Highway Revenue Provisions

# TITLE I—TAX FREEZE; TAX REFORMS GENERALLY

**SEC 10 TABLE OF CONTENTS**

Sec 1 Short title, etc

TITLE I—TAX FREEZE, TAX REFORMS GENERALLY

Sec 10 Table of Contents

Subtitle A—Deferral of Certain Tax Reductions

Sec 11 Short title

PART I—INCOME TAX PROVISIONS

Sec 12 Amount of used property eligible for investment tax credit
Sec 13 Finance lease provisions
Sec 14 Election to expense certain depreciable business assets
Sec 15 Employee stock ownership credit
Sec 16 Cost-of-living adjustments in pension plan limitations
Sec 17 Repeal of partial interest exclusion
Sec 18 Foreign earned income of individuals

PART II—ESTATE AND GIFT TAX RATES

Sec 21 Maximum rate

PART III—EXCISE TAXES

Sec 25 Tax rate on newly discovered oil
Sec 26 Excise tax on communications services
Sec 27 Excise tax on cigarettes and distilled spirits

Subtitle B—Tax-Exempt Entity Leasing

Sec 31 Short title
Sec 32 Denial of tax incentives for property used by governments and other tax-exempt entities
Sec 33 Study of present class life of certain high technology property

Subtitle C—Treatment of Bonds and Other Debt Instruments

Sec 41 Treatment of bonds and other debt instruments
Sec 42 Technical and conforming amendments related to original issue discount changes

Sec. 102. Section 1256 extended to certain options.
Sec. 103. Regulations under section 1092(b).
Sec. 104. Limitation on losses from hedging transactions.
Sec. 105. Clarification that section 1234 applies to cash settlement options.

Subtitle I—Employee Benefit Provisions

PART I—WELFARE BENEFIT PLANS

Sec. 111. Treatment of funded welfare benefit plans.
Sec. 112. Treatment of unfunded deferred benefits.
Sec. 113. Additional requirements for tax-exempt status of certain organizations.
Sec. 114. Amendments to tax on unrelated business income.
Sec. 115. Employer and employee benefit association treated as related persons under section 1239.

PART II—OTHER PROVISIONS

Sec. 116. Treatment of certain medical, etc., benefits under section 415.
Sec. 117. Limitation on accrual of vacation pay.
Sec. 118. Determination of whether there is a collective bargaining agreement.
Sec. 119. Disqualification of plan where substantially all contributions are employee contributions.
Sec. 120. Participation and discrimination standards applicable to cash or deferred arrangements.

Subtitle J—Foreign Provisions

Sec. 131. Treatment of related person factoring income.
Sec. 132. Taxation of certain transfers of property outside the United States.
Sec. 133. Section 1248 to apply to certain indirect transfers of stock in a foreign corporation.
Sec. 134. Treatment of United States source original issue discount in case of foreign persons.
Sec. 135. Clarification of definition of articles produced in Puerto Rico or the Virgin Islands.
Sec. 136. Treatment of certain transportation income.
Sec. 137. Treatment of payments to Guam and Virgin Islands corporations.
Sec. 138. Application of collapsible corporation rules to foreign corporations.
Sec. 139. Definition of foreign investment company.
Sec. 140. Treatment of certain distributions received by United States-owned foreign corporations.
Sec. 141. Interest and dividends paid by certain United States-owned foreign corporations treated as derived from United States sources.
Sec. 142. Certain dividends treated as interest for purposes of the limitation on the foreign tax credit.

Subtitle K—Reporting, Penalty, and Other Provisions

Sec. 151. Organizers and sellers of potentially abusive tax shelters must keep lists of investors.
Sec. 152. Returns relating to mortgage interest received in trade or business.
Sec. 153. Returns relating to foreclosures and abandonments of security.
Sec. 154. Increase in penalty for promoting abusive tax shelters.
Sec. 155. Reporting of State and local refunds not required with respect to nonitemizers.

**"Subpart D—Treatment of Welfare Benefit Funds**

"Sec. 419. Treatment of funded welfare benefit plans:

**"SEC. 419. TREATMENT OF FUNDED WELFARE BENEFIT PLANS.**

"(a) GENERAL RULE.—Contributions paid or accrued by an employer to a welfare benefit fund—

"(1) shall not be deductible under section 162 or 212, but

"(2) if they satisfy the requirements of either of such sections, shall (subject to the limitation of subsection (b)) be deductible under this section for the taxable year in which paid.

"(b) LIMITATION.—The amount of the deduction allowable under subsection (a)(2) for any taxable year shall not exceed the welfare benefit fund's qualified cost for the taxable year.

"(c) QUALIFIED COST.—For purposes of this section—

"(1) IN GENERAL.—Except as otherwise provided in this subsection, the term 'qualified cost' means, with respect to any taxable year, the sum of—

"(A) the qualified direct cost for such taxable year, and

"(B) subject to the limitation of paragraph (4)(B), any addition to a qualified asset account for the taxable year.

"(2) INCOME ADJUSTMENTS.—In the case of any welfare benefit fund, the qualified cost for any taxable year shall be reduced by such fund's after-tax income for such taxable year.

"(3) QUALIFIED DIRECT COST.—

"(A) IN GENERAL.—The term 'qualified direct cost' means, with respect to any taxable year, the aggregate amount which would have been allowable as a deduction to the employer with respect to the benefits provided during the taxable year, if—

"(i) such benefits were provided directly by the employer, and

"(ii) the employer used the cash receipts and disbursements method of accounting.

"(B) TIME WHEN BENEFITS PROVIDED.— For purposes of subparagraph (A), a benefit shall be treated as provided when such benefit would be includible in the gross income of the employee if provided directly by the employer (or would be so includible but for any provision of this chapter excluding such benefit from gross income).

"(C) ADJUSTMENT TO QUALIFIED DIRECT COST FOR EXCESS CHANGEOVER RESERVE.—

"(i) IN GENERAL.—In the case of a welfare benefit fund with an excess changeover reserve, the qualified direct cost for any taxable year—

"(I) shall be applied against the amount of such reserve, and

"(II) to the extent so applied shall not be taken into account under paragraph (1)(A).

"(ii) EXCESS RESERVE REDUCED NOT MORE RAPIDLY THAN RATABLY OVER 5 TAXABLE YEARS.—Clause (i) shall not apply for any taxable year to the extent that the application of clause (i) to such taxable year and preceding taxable years result in the excess changeover reserve being reduced more rapidly than ratably over the first 5 taxable years ending after March 31, 1984.

"(iii) EXCESS CHANGEOVER RESERVE.—For purposes of this subparagraph, the term 'excess changeover reserve' means the excess of—

"(I) the amount of assets set aside for purposes described in paragraph (4)(A) as of March 31, 1984, over

"(II) the amount which would have been permitted to be set aside under paragraph (4)(B) as of such date.

"(4) QUALIFIED ASSET ACCOUNT.—

"(A) IN GENERAL.—The term 'qualified asset account' means any assets set aside to provide for the payment of welfare benefits, other than facilities used in the provision of such benefits.

"(B) LIMITATION.—The limitation provided by this subparagraph for any taxable year is the amount (if any) which would have to be added to the qualified asset account so that the amount in such account as of the close of the taxable year equals 75 percent of the average annual qualified direct costs (other than insurance premiums) for taxable years in the base period for benefits for which reserves are permitted.

"(C) VALUATION.—For purposes of subparagraph (B), the amount of the qualified asset account shall be the value of the assets in such account (as determined under regulations).

"(D) BASE PERIOD.—The term 'base period' means the period consisting of the taxable year and the preceding taxable year.

"(E) BENEFITS FOR WHICH RESERVES ARE PERMITTED.—The term 'benefits for which reserves are permitted' means any life insurance, accident, sickness, severance pay, supplemental unemployment, or group legal benefits.

"(F) HIGHER LIMITATION IN CERTAIN CASES.—In the case of benefits for which reserves are permitted, the Secretary shall by regulations provide that the amount of the qualified asset account may exceed the limitation of subparagraph (B)—

"(i) if the limitation of subparagraph (B) is less than the amount of claims incurred but unpaid and expected to be paid before the close of the next taxable year, or

"(ii) if the liability for which the account was established is under a collective bargaining agreement and a higher reserve is necessary.

"(5) AFTER-TAX INCOME.—

"(A) IN GENERAL.—The term 'after-tax income' means, with respect to any taxable year, the gross income of the welfare benefit fund reduced by the sum of—

31-409 O - 84 - 15 BK 1

"(i) the deductions allowed by this chapter which are directly connected with the production of such gross income, and

"(ii) the tax imposed by this chapter on the fund for the taxable year.

"(B) TREATMENT OF CERTAIN AMOUNTS.—In determining the gross income of any welfare benefit fund—

"(i) contributions and other amounts received from employees shall be taken into account, but

"(ii) contributions from the employer shall not be taken into account.

"(6) ITEM ONLY TAKEN INTO ACCOUNT ONCE.—No item may be taken into account more than once in determining the qualified cost of any welfare benefit fund.

"(d) CARRYOVER OF EXCESS CONTRIBUTIONS.—If—

"(1) the amount of the contributions paid (or deemed paid under this subsection) by the employer during any taxable year to a welfare benefit fund, exceeds

"(2) the limitation of subsection (b),

such excess shall be treated as an amount paid by the employer to such fund during the succeeding taxable year.

"(e) Welfare Benefit Fund.—For purposes of this section—

"(1) In general.—The term 'welfare benefit fund' means any fund—

"(A) which is part of a plan of an employer, and

"(B) through which the employer provides welfare benefits to employees or their beneficiaries.

"(2) Welfare benefit.—The term 'welfare benefit' means any benefit other than a benefit with respect to which—

"(A) section 83(h) applies,

"(B) section 404 applies (determined without regard to section 404(b)(2)),

"(C) section 404A applies, or

"(D) an election under section 463 applies.

"(3) Fund.—The term 'fund' means—

"(A) any organization described in paragraph (7), (9), (17), or (20) of section 501(c), and

"(B) any trust, corporation, or other organization not exempt from the tax imposed by this chapter.

"(f) Method of Contributions, Etc., Having the Effect of a Plan.—If—

"(1) there is no plan, but

"(2) there is a method or arrangement of employer contributions or benefits which has the effect of a plan,

this section shall apply as if there were a plan.

"(g) EXTENSION TO PLANS FOR INDEPENDENT CONTRACTORS.—If any fund would be a welfare benefit fund (as modified by subsection (f)) but for the fact that there is no employee-employer relationship—

"(1) this section shall apply as if there were such plan, and

"(2) any references in this section to the employer shall be treated as a reference to the person for whom services are provided, and any reference in this section to an employee shall be treated as a reference to the person providing the services.

"(h) AGGREGATION RULES.—For purposes of this section—

"(1) AGGREGATION OF FUNDS OF EMPLOYER.—All welfare benefit funds of an employer shall be treated as 1 fund.

"(2) TREATMENT OF RELATED EMPLOYERS.—Rules similar to the rules of subsections (b), (c), (m), and (n) of section 414 shall apply. For purposes of the

preceding sentence, section 414(m)(5)(B) shall be applied by substituting 'section 318' for 'section 267(c)'.

"(i) REGULATIONS.—The Secretary shall prescribe such regulations as may be appropriate to carry out the purposes of this section. Such regulations may provide that the plan administrator of any welfare benefit fund which is part of a multiemployer plan shall submit such information to the employers contributing to the fund as may be necessary to enable the employers to comply with the provisions of this section."

(b) CLERICAL AMENDMENT.—The table of subparts for part I of subchapter D of chapter 1 is amended by adding at the end thereof the following new item:

"Subpart D. Treatment of welfare benefit funds."

(c) EFFECTIVE DATES.—

(1) IN GENERAL.—Except as otherwise provided in this subsection, the amendments made by this section shall apply to contributions paid or accrued after March 31, 1984, in taxable years ending after such date.

(2) SPECIAL RULE FOR COLLECTIVE BARGAINING AGREEMENTS.—In the case of a plan maintained pursuant to 1 or more collective bargaining agreements—

(A) between employee representatives and 1 or more employers, and

(B) in effect on March 1, 1984 (or ratified on or before such date),

the amendments made by this section and section 114 shall not apply to years beginning before the later of (i) the date on which the last of the collective bargaining agreements relating to the plan terminates (determined without regard to any extension thereof agreed to after March 1, 1984), or (ii) January 1, 1986.

(3) SPECIAL RULE FOR PARAGRAPH (2).—For purposes of paragraph (2), any plan amendment made pursuant to a collective bargaining agreement relating to the plan which amends the plan solely to conform to any requirement added by this section or section 114 shall not be treated as a termination of such collective bargaining agreement.

**SEC 112. TREATMENT OF UNFUNDED DEFERRED BENEFITS.**

(a) GENERAL RULE.—Subsection (b) of section 404 (relating to method of contributions, etc., having the effect of a plan) is amended to read as follows:

"(b) METHOD OF CONTRIBUTIONS, ETC., HAVING THE EFFECT OF A PLAN; UNFUNDED DEFERRED BENEFITS.—

"(1) METHOD OF CONTRIBUTIONS, ETC., HAVING THE EFFECT OF A PLAN.—If—

"(A) there is no plan, but

"(B) there is a method or arrangement of employer contributions or compensation which has the effect of a stock bonus, pension, profit-sharing, or annuity plan, or other plan deferring the receipt of compensation (including a plan described in paragraph (2)),

subsection (a) shall apply as if there were such a plan.

"(2) PLANS PROVIDING UNFUNDED DEFERRED BENEFITS.—

"(A) IN GENERAL.—For purposes of this section, any plan providing for deferred benefits (other than compensation) for employees, their spouses, or their dependents shall be treated as a plan deferring the receipt of compensation. In the case of such a plan, for purposes of this section, the determination of when an amount is includible in gross income shall be made without regard to any provisons of this chapter excluding such benefits from gross income.

"(B) EXCEPTION FOR FUNDED BENEFITS.—Subparagraph (A) shall not apply to any benefit provided through a welfare benefit fund (as defined in section 419(e))."

(b) CROSS REFERENCE.—Subsection (j) of section 162 (relating to cross references) is amended by adding at the end thereof the following new paragraph:

"(3) For special rules relating to—

"(A) funded welfare benefit plans, see section 419, and

"(B) deferred compensation and other deferred benefits, see section 404."

(c) EFFECTIVE DATE.—The amendments made by this section shall apply to amounts paid or incurred after March 31, 1984, in taxable years ending after such date.

**SEC. 113. ADDITIONAL REQUIREMENTS FOR TAX-EXEMPT STATUS OF CERTAIN ORGANIZATIONS.**

(a) GENERAL RULE.—Part I of subchapter P of chapter 1 (relating to exempt organizations) is amended by adding at the end thereof the following new section:

**"SEC. 505. ADDITIONAL REQUIREMENTS FOR ORGANIZATIONS DESCRIBED IN PARAGRAPH (9), (17), OR (20) OF SECTION 501(c).**

"(a) CERTAIN REQUIREMENTS MUST BE MET IN THE CASE OF ORGANIZATIONS DESCRIBED IN PARAGRAPH (9), (17), OR (20) OF SECTION 501(c).—

"(1) VOLUNTARY EMPLOYEES' BENEFICIARY ASSOCIATIONS, ETC.—An organization described in paragraph (9) or (20) of subsection (c) of section 501 which is part of a plan of an employer shall not be exempt from tax under section 501(a) unless such plan meets

the requirements of paragraphs (1) and (2) of subsection (b) of this section.

"(2) SUPPLEMENTAL UNEMPLOYMENT COMPENSATION BENEFIT TRUSTS.—A trust described in paragraph (17) of subsection (c) of section 501 shall not be exempt from tax under section 501(a) unless the plan of which such trust is a part meets the requirements of paragraph (1) of subsection (b) of this section.

"(3) EXCEPTION FOR COLLECTIVE BARGAINING AGREEMENTS.—Paragraphs (1) and (2) shall not apply to any organization which is part of a plan maintained pursuant to 1 or more collective bargaining agreements between 1 or more employee organizations and 1 or more employers.

"(b) REQUIREMENTS.—

"(1) UTILIZATION.—A plan meets the requirements of this paragraph with respect to any class of benefits for any year only if the benefits of such class provided under the plan during such year to highly compensated individuals do not exceed 25 percent of the benefits of such class provided under such plan during such year.

"(2) NONDISCRIMINATION REQUIREMENTS.—

"(A) IN GENERAL.—Except as provided in subparagraph (B), a plan meets the requirements of this paragraph only if—

"(i) each class of benefits under the plan is provided under a classification which is set forth in the plan and which is found by the Secretary not to be discriminatory in favor of employees who are highly compensated individuals, and

"(ii) in the case of each class of benefits, such benefits do not discriminate in favor of employees who are highly compensated employees.

A life insurance, disability, severance pay, or supplemental unemployment benefit shall not be considered to fail to meet the requirements of clause (ii) merely because the benefits received bears a uniform relationship to the total compensation, or the basic or regular rate of compensation, or employees covered by the plan.

"(B) APPLICATION OF PARAGRAPH WHERE OTHER NONDISCRIMINATION RULES PROVIDED.—In the case of any benefit for which nondiscrimination rules are applicable under a provision of law other than this subsection, the require-

ments of this paragraph are met only if such rules are satisfied with respect to such benefit.

"(C) AGGREGATION RULES.—Rules similar to the rules of section 419(h) shall apply for purposes of this subsection.

"(3) HIGHLY COMPENSATED INDIVIDUAL.—For purposes of this subsection, the term 'highly compensated individual' has the meaning given such term by section 105(h)(5). For purposes of the preceding sentence, section 105(h)(5) shall be applied by substituting '10 percent' for '25 percent'.

"(c) REQUIREMENT THAT ORGANIZATION NOTIFY SECRETARY THAT IT IS APPLYING FOR TAX-EXEMPT STATUS.—

"(1) IN GENERAL.—An organization shall not be treated as an organization described in paragraph (9), (17), or (20) of section 501(c)—

"(A) unless it has given notice to the Secretary, in such manner as the Secretary may by regulations prescribe, that it is applying for recognition of such status, or

"(B) for any period before the giving of such notice, if such notice is given after the time prescribed by the Secretary by regulations for giving notice under this subsection.

"(2) SPECIAL RULE FOR EXISTING ORGANIZATIONS.—In the case of any organization in existence on March 31, 1984, the time for giving notice under paragraph (1) shall not expire before the date 1 year after the date of the enactment of this section."

(b) CLERICAL AMENDMENT.—The table of sections for part I of subchapter P of chapter 1 is amended by adding at the end thereof the following new item:

"Sec. 505. Additional requirements for organizations described in paragraph (9), (17), or (20) of section 501(c)."

(c) EFFECTIVE DATE.—The amendments made by this section shall apply to taxable years beginning after December 31, 1984.

**SEC. 114. AMENDMENTS TO TAX ON UNRELATED BUSINESS INCOME.**

(a) EXTENSION OF SECTION 512(a)(3) TO SUPPLEMENTAL UNEMPLOYMENT BENEFIT AND GROUP LEGAL TRUSTS.—

(1) Paragraph (3) of section 512(a) (relating to special rules applicable to organizations described in section 501(c) (7) or (9)) is amended by striking out "section 501(c) (7) or (9)" each place it appears (including in the paragraph heading) and inserting in lieu thereof "paragraph (7), (9), (17), or (20) of section 501(c)".

(2) Clause (ii) of section 512(a)(3)(B) is amended by striking out "section 501(c)(9)" and inserting in lieu thereof "paragraph (9), (17), or (20) of section 501(c)".

(b) LIMITATION ON DEDUCTION FOR SET-ASIDE.—Paragraph (3) of section 512(a) is amended by adding at the end thereof the following new subparagraph:

"(E) LIMITATION ON AMOUNT OF SET-ASIDE IN THE CASE OF ORGANIZATIONS DESCRIBED IN PARAGRAPH (9), (17), OR (20) OF SECTION 501(C).—

"(i) IN GENERAL.—In the case of any organization described in paragraph (9), (17), or (20) of section 501(c), a set-aside for any purpose specified in clause (ii) of subparagraph (B) may be taken into account under subparagraph (B) only to the extent that such set-aside does not result in an amount of assets set aside for such purpose in excess of the limitation of section 419(c)(4)(B).

"(ii) SPECIAL RULES.—For purposes of clause (i)—

"(I) in the case of any organization which is a member of a group of organizations treated as 1 organization under section 419(h), the limitation of section

419(c)(4)(B) shall be such organization s proportionate share of such limitation determined for such group and

(II) assets used in the provision of benefits described in clause (ii) of subparagraph (B) shall not be taken into account

(c) EFFECTIVE DATE —The amendments made by this section shall apply to taxable years beginning after December 31 1984

**SEC 115 EMPLOYER AND EMPLOYEE BENEFIT ASSOCIATION TREATED AS RELATED PERSONS UNDER SECTION 1239**

(a) GENERAL RULE —Section 1239 (relating to gain from sale of depreciable property between certain related taxpayers) is amended by adding at the end thereof the following new subsection

(d) EMPLOYER AND RELATED EMPLOYEE ASSOCIATION —For purposes of subsection (a) the term related person also includes—

(1) an employer and any person related to the employer (within the meaning of subsection (b)) and

(2) an organization described in paragraph (7) (9) (17) or (20) of section 501(c) and which is con

trolled directly or indirectly by persons referred to in paragraph (1)."

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply to sales or exchanges after December 31, 1984, in taxable years ending after such date.

## PART II—OTHER PROVISIONS

### SEC. 116. TREATMENT OF CERTAIN MEDICAL, ETC., BENEFITS UNDER SECTION 415.

(a) GENERAL RULE.—Section 415 (relating to limitations on benefits and contributions under qualified plan) is amended by adding at the end thereof the following new subsection:

"(l) TREATMENT OF CERTAIN MEDICAL BENEFITS.—

"(1) IN GENERAL.—For purposes of this section, contributions allocated to any individual medical account which is part of a defined benefit plan shall be treated as an annual addition to a defined contribution plan for purposes of subsection (c).

"(2) INDIVIDUAL MEDICAL BENEFIT ACCOUNT.—For purposes of paragraph (1), the term 'individual medical benefit account' means any separate account—

"(A) which is established for a participant under a defined benefit plan, and

## I. Employee Benefit Provisions

### 1. Treatment of Funded Welfare Benefit Plans (sec. 111 of the bill and sec. 419 of the Code)

#### *Present Law*

The Code generally allows a deduction for ordinary and necessary expenses paid or incurred during a taxable year in carrying on a trade or business, including a reasonable allowance for salaries and other compensation for personal services actually rendered.[1] The deduction for compensation is limited to amounts that constitute reasonable compensation. Treasury regulations provide for the deduction of amounts "paid or accrued within the taxable year for dismissal wages, unemployment benefits, guaranteed annual wages, vacations, or a sickness, accident, hospitalization, medical expense, recreational, welfare, or similar benefit plan ... if they are ordinary and necessary expenses of the trade or business".[2] Additional limitations and restrictions are provided by other provisions of the Code.[3]

The special deduction-timing rules and rules for measuring deductions that apply to amounts paid under a plan of deferred compensation[4] do not apply to deductions for welfare benefits if those benefits are not regarded as deferred compensation. Neither the Code nor the Treasury regulations provides a definition that clearly distinguishes welfare benefits from deferred compensation. In the past, for example, a plan providing educational benefits to the children of employees was regarded as a plan of deferred compensation and no deductions were allowed for employer contributions to the trust before the benefits were includible in the gross income of the employees.[5] Recently, however, a plan providing educational benefits to employees' children was found to be a welfare plan and the employer was allowed a current deduction for contributions to the plan.[6] If the rules for determining the amount and timing of deductions for contributions paid to deferred compensation plans do not apply to welfare benefit plans, an employer may be allowed a deduction for a contribution under a welfare benefit trust before the benefit is actually provided to an employee.

---

[1] Sec 162(a)(1)

[2] Treas Reg sec. 1.162-10(a) Treas Reg sec 1 162-10(c) provides, however, that deductions for contributions under any plan deferring the receipt of compensation are governed by section 404.

[3] See, for example, sec. 264 (deductions for certain life insurance premiums are denied), sec 267 (deductions for certain accrued but unpaid expenses are denied if the expense is payable to a related, cash method person), and 274 (deductions for certain entertainment, amusement, and recreational facilities are denied if the facilities are not primarily for the benefit of employees other than officers, owners, or highly compensated employees).

[4] Sec. 404. A deduction also is allowed for contributions to provide disability, incidental death benefits and post-retirement medical benefits under a qualified pension plan.

[5] See, for example, Rev Rul 75-488, 1975-2 CB 55, and *Citrus Orthopedic Medical Group, Inc.*, 72 TC 461 (1979), *Grant-Jacoby, Inc. v. Commissioner*, 73 T C. 700 (1980).

[6] *Greensboro Pathology Associates, P.A v. United States*, 698 F 2d 1196 (Fed Cir. 1982)

For both cash and accrual method taxpayers, Treasury regulations provide that if an expenditure results in the creation of an asset having a useful life which extends substantially beyond the close of the taxable year, such an expenditure may not be deductible, or may be deductible only in part, for the taxable year in which made or incurred.[7] The regulations provide for ratable amortization of such items. For example, if a cash method taxpayer prepays premiums on insurance provided as an employee benefit, proration of the premiums has generally been required to determine the amount deductible in a particular year.[7a] Proration has also been required in the case of life insurance premiums paid by an accrual method taxpayer.[8]

***Reasons for Change***

The committee has concluded that the favorable tax treatment of employer contributions to welfare benefit plans, as compared with employer payments of wages and salary, is inappropriate in view of the favorable tax treatment already provided to employees, i.e., the exclusion of many of these benefits from adjusted gross income. In addition, the committee believes that the current rules under which employers may take deductions for plan contributions far in advance of when the benefits are paid allows excessive tax-free accumulation of funds.

The committee's concern has been caused by recent discussion among tax practitioners as to the tax-shelter potential of welfare benefit plans. Commentators have pointed out that the combination of advance deductions for contributions and the availability of tax exemption for certain employee benefit organizations (such as the voluntary employees' beneficiary association or VEBA) provides tax treatment very similar to that provided to qualified pension plans, but with far fewer restrictions. This discussion became considerably more active after the enactment of the pension provisions of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA). Congress had become concerned that qualified pension plans were being used to provide excessive amounts of tax benefits to relatively high-income individuals. Rules were adopted that lowered the dollar limits on the annual contributions that could be made to qualified pension plans and the benefits that could be paid out of them. In addition, further restrictions on certain plans required increased benefits for rank-and-file employees.

In one article on the use of employee benefit plans as a tax shelter, an example is given of how a small professional corporation may utilize the tax benefits of a severance pay plan funded by a VEBA. In this example, the employees of the corporation are two doctors ages 50 and 55, with annual salaries of $150,000 and $200,000, respectively, and three other workers, ages 20 to 36, with annual salaries of $10,000 to $18,000. The example indicates that the corporation could make tax deductible annual contributions to a tax-exempt VEBA of more than $55,000 annually under terms that would make it unlikely that the three lower-paid employees

[7] Treas Reg sec 1 461-1(a)(1) and (2).
[7a] See Rev Rul 70-413, 1970-2 CB 103
[8] *Trinity Construction Co., Inc v. United States*, 424 F.2d 303 (5th Cir 1970)

would receive substantial benefits from the plan. Some of this recent literature also pointed out that a VEBA could be used as a basis for claiming a deduction for the full cost of acquiring ski chalets and yachts for the use of the employees. While a direct purchase of the facility by the employer would only permit deductions over the useful life of the depreciable property.

Thus, the committee is concerned that substantial advance funding of welfare benefits will ultimately lead to an unacceptable tax burden for many taxpayers who do not participate in these programs. Accordingly, the committee has provided that, as a general matter, employers should not be permitted a current deduction for welfare benefits that may be provided in the future. Instead, the committee believes that employers should generally be permitted to deduct employer contributions to a welfare benefit plan on the same basis as if the employer had provided the benefits directly to the employees. Further, this provision is consistent with the provision on premature accruals elsewhere in this bill, under which a deduction with respect to an employee benefit is not allowed before the benefit is paid. If this provision on funded plans were not also included, accrual-method employers could use funded plans to achieve deductions much earlier than those allowed under the revised accrual rules.

The committee recognizes, however, that it is appropriate to permit a reasonable level of reserves to accumulate in a welfare benefit plan for certain self-funded insurance-type benefits, such as life, accident, sickness, disability, severance pay, supplemental unemployment compensation, and group legal service benefits. Accordingly, although deductions for advance funding already are allowed for disability and post-retirement medical benefits that are part of a qualified pension plan, the committee has provided that an employer also should be permitted to deduct contributions for funding a limited reserve in a welfare benefit plan for these particular benefits.

### *Explanation of Provision*

#### *In general*

The bill provides additional rules for determining the timing and the amount of an employer's deduction for a contribution to a funded welfare benefit plan. Under the bill, a contribution which is otherwise deductible under the Code will be deductible only to the extent that it does not exceed the qualified cost of the plan for the taxable year. The limitation also applies to contributions with respect to independent contractors.

Under the bill, if an employer pays or accrues[9] a contribution to a funded welfare benefit plan during a taxable year, and the usual requirements for deductibility are met,[10] the contribution will be

[9] If the taxpayer has elected to deduct accrued vacation pay under section 463, the deduction would be limited to the amount properly accrued under that section for a contribution to the fund providing the vacation pay

[10] Secs 162 and 212 Of course, in determining whether compensation is reasonable compensation under sec 162, welfare benefits provided by the employer are taken into account as compensation.

deductible for the taxable year in which paid to the extent that it does not exceed the qualified cost of the plan for the year.[11] The bill provides that the qualified cost of a funded welfare benefit plan for a year is generally the sum of (1) the qualified direct cost of the plan for the year, and (2) the reasonable addition to the qualified asset account maintained by the fund for the year. Under the bill, the qualified cost is reduced by the after-tax income of the fund for the year.

In the case of a sale of property by an employer to a welfare benefit fund for less than fair market value, the excess of fair market value over the selling price is treated as an employer contribution to the plan. Of course, this rule does not change present law with respect to the disallowance of deductions for losses on transactions between related parties (sec. 267).

***Qualified direct cost***

The bill provides that the qualified direct cost for any taxable year of the employer is the aggregate amount which would have been allowable as a deduction to a cash method taxpayer with respect to benefits provided during the taxable year if that taxpayer had provided the benefits directly on a current basis. This may include properly allocable administrative costs and insurance premiums as well as direct benefit costs. For example, in the case of a self-insured medical reimbursement plan, the qualified direct cost equals the actual benefit payments made to employees for the taxable year, plus a properly allocable share of the administrative costs of providing such benefits.

With respect to the ownership by the fund of recovery property, the qualified direct cost for a year is the deduction that would have been allowed to the employer under sec. 168 for that property for the year if the employer had owned the recovery property. Thus, in the year of a contribution of recovery property by an employer to a fund under a plan, the contribution would be treated as a sale of the property in that year (as under present law) and, if the property is placed in service that year, the employer would be allowed only the deduction with respect to the first year the property is placed in service under the usual rules for determining deductions for recovery property.[12]

Other rules that generally limit deductions are also "passed through" under the bill to limit deductions with respect to fund contributions. Thus, if an employer contributes amounts that the fund uses for the purchase of land used for an employee recreational facility, no deduction is allowed with respect to this contribution because sec. 263 would not have allowed a deduction if the employer had purchased the land directly. Similarly, other expenses of the fund (such as maintenance expenses) with respect to this facility would be qualified direct costs giving rise to employer deductions only if the requirements of sec. 274 are satisfied. As a further example, fund expenditures for insurance that would not have been

[11] The amount would be deductible for the employer's taxable year in which (or with which) the plan year ends.

[12] Sec 115 of the bill also extends the rules of the Code relating to sales of property between related parties (sec 1239) to certain exempt organizations

deductible under sec. 264 if made directly by the employer are not qualified direct costs and, thus, no deductions are available to the employer with respect to such expenditures.

Under the bill, for the purpose of determining the qualified direct cost, a benefit is to be treated as provided when the benefit would be includible in the gross income of the employee (or would be includible in the employee's gross income but for a provision of the Code).[13]

### *Qualified asset account*

The qualified cost of a funded welfare benefit plan for a taxable year of an employer may include an addition to the qualified asset account under the fund for the year. Under the bill, a qualified asset account consists of assets set aside to provide for the payment of welfare benefits. Plan assets consisting of facilities, such as a child care center, directly used in the provision of such benefits would not be reflected in the account because the facility is used to provide the benefit rather than to provide for the payment of the benefit.

The bill provides limits on the amount of the addition to a qualified asset account for a taxable year of the employer. Under the bill, the addition is generally limited to the amount that would have to be added to the account so that the amount of the account as of the close of any taxable year of the fund ending with or within the employer's taxable year is not to be greater than 75 percent of the average qualified direct cost (other than insurance premiums) of the plan for benefits for which reserves are permitted for the taxable year and the preceding taxable year.[14] Benefits for which reserves may be permitted include benefits payable on account of death, accident or sickness (including disability), unemployment, severance pay or legal expenses.[15]

Under the bill, the addition to the qualified asset account for a year is to be determined on the basis of the difference between the value of the assets in the account at the beginning of the year and the limitation described above (changes in asset values during a year would not affect the balance of the account until the begin-

---

[13] For example, if an employer contributes to a fund to pay premiums or considerations for insurance under a plan, then the qualified direct cost for the year would be determined on the basis of the cost of the insurance for the period for which the coverage is provided, without regard to whether any part of that cost is excludable from the gross income of an employee. On the other hand, to the extent the liability is self-insured, the time at which benefits would be included would be based on the time at which benefits are paid, rather than the time of current insurance coverage, because this is the time the when benefits would be included if the self-insured benefits were provided directly by the employer on an unfunded basis

[14] The qualified direct cost of the plan for a period preceding the effective date is to be determined as if the bill were effective for the earlier period. For the first year in which a plan is funded, the qualified direct cost for the preceding year is deemed to be zero, so that the maximum addition to the qualified asset account is based on 37.5 percent of the qualified direct cost for the year

[15] Of course, the amount allowed as a deduction for an addition to the qualified asset account is also limited by the usual rules for deductibility. Accordingly, the amount allowed as a deduction for a year for an addition to the account is not to exceed the amount considered to be an ordinary and necessary business expense for the year and may be subject to other restrictions (*e.g.*, sec 263) If it is not appropriate to maintain a reserve to provide a benefit, then under the bill, no amount would be allowed as a deduction for an addition to the qualified asset account

The committee expects that Treasury regulations relating to the determination of whether an addition to the qualified asset account is an ordinary and necessary business expense will require the use of reasonable actuarial principles and level funding over an appropriate period of years.

ning of the next year). The committee expects that Treasury regulations will provide rules for the valuation of assets. Under these regulations, it is expected that the value taken into account for assets at a particulter time generally will be based on the fair market value at that time, although it is expected that bonds and similar debt instruments may be valued on the basis of amortization.

The bill provides that the Secretary may, by regulation, allow for higher account limits with respect to benefits for which reserves are permitted in two types of cases. First, a higher limit may be provided if the usual limit would be inadequate to provide a reserve equal to the amount of incurred but unpaid claims that are reasonably expected to be paid before the close of the next taxable year. For example, if the usual limit on the qualified asset account is not adequate to enable the plan to pay, out of such account, the next year's expected disability benefits to individuals who had become disabled before the end of the current taxable year and who are expected to receive benefits before the close of the next taxable year, then the higher limit provided by this rule would be available. Under this provision, the actuarial assumptions on which the higher limit is based must be reasonable in the aggregate. The committee expects that Treasury regulations may require the written opinion of an enrolled actuary[16] with respect to the reasonableness of these assumptions.

In the case of a fund maintained pursuant to a collective bargaining agreement, under Treasury regulations which take into account the special needs of particular plans to accumulate funds, a larger limit will be permitted.[17]

*Changeover reserve.*—Under the bill, in the case of a plan that holds assets in excess of the limit on the qualified asset account on the effective date, the excess, as of that date, is to be credited to an excess changeover reserve. Thereafter, the qualified direct cost of the plan is to be applied against the excess changeover reserve and is not to be considered to be provided from employer contributions for which a deduction may be allowed under the bill. The bill provides that the application against the excess changeover reserve for a year is not to reduce the balance of that reserve more rapidly than ratably over the first five years ending after March 31, 1984.

***After-tax income***

The bill provides that the qualified cost for a taxable year under a funded welfare benefit plan is to be reduced by the fund's after-tax income for the year. Under the bill, the after-tax income of a fund for a taxable year is the gross income of the fund, reduced by deductions directly connected with the production of that gross income for the year and by the income tax (if any) imposed on the fund for the year. In determining the gross income of a fund, contributions and other amounts received from employees (dues, fees, etc.) are to be taken into account as income but employer contribu-

[16] Section 7701(a)(35)

[17] Under the bill, to enable employers to comply with the requirements of the bill, Treasury regulations may require that any fund to which more than one employer contributes notify contributing employers of the percentage (if any) or amount of contributions for a year that is not deductible.

tions are not to be taken into account. Accordingly, employee contributions, etc., will reduce an employer's qualified cost of a plan for a year. The bill provides that no item is to be taken into account more than once in determining the qualified cost for a year.

*Carryovers*

The bill provides for carryovers of excess contributions from years in which contributions exceed the qualified costs to subsequent years. Under the bill, if the amount contributed (or deemed contributed under the carryover rule) to a funded welfare benefit plan by an employer during a taxable year exceeds the qualified cost of the plan for the year, but is otherwise deductible, then the excess is to be treated as an amount paid by the employer under the plan in the succeeding taxable year. Amounts contributed before the effective date and not previously deducted would be deductible under the rules of present law.

*Funded welfare benefit plan*

Generally, a plan is a funded welfare benefit plan if it provides welfare benefits to employees (or their beneficiaries) and the plan includes a fund.[18] The bill provides, however, that a plan of deferred compensation is not a funded welfare benefit plan.[19] In addition, the bill provides that a plan is not a funded welfare benefit plan to the extent the special rules for transfers of property in connection with services apply in determining the timing or amount of the employer's deduction.[20] The bill provides that if there is no plan, but a method or arrangement of employer contributions or benefits which has the effect of a plan, the rules of the bill are to apply as if there were a plan. In addition, under the bill, if any plan would be a funded welfare plan (including, of course, a method, etc., having the effect of a plan) but for the fact that there is no employee-employer relationship, then the bill is to apply as if there were such a plan.

*Aggregation rules*

In applying the rules of the bill relating to funded welfare benefit plans, all funds under all welfare benefit plans of an employer are to be treated as a single fund, and all employees who are treated as employed by a single employer under the rules relating to qualified pension plans,[21] are to be treated as employed by a single

---

[18] The bill defines the term "fund" for this purpose as (1) any organization described in paragraph (7), (9), (17), or (20) of section 501(c) (a social club, a voluntary employee beneficiary's association, a supplemental unemployment benefit trust, or a qualified group legal organization) or (2) any corporation, trust, or other organization that is not exempt from income tax. Such an organization includes a retired lives reserve account maintained by an insurance company. Further, if an employer contributes amounts to an insurance company for benefits that are purely experience-rated (i e , the employer is entitled to an automatic rebate if the amount paid exceeds benefit claims and is liable if the benefit claims exceed the amount paid), such contributions are considered to have been made to a welfare benefit fund. On the other hand, employer contributions to a separate bank account of the employer or to a subsidiary or other related party would not be considered contributions to a fund

[19] Section 404 provides deduction rules for domestic plans of deferred compensation. Sec. 404A provides rules for foreign plans of deferred compensation. The bill also provides rules for the treatment of unfunded deferred benefits provided under a plan Accordingly, except for current, unfunded compensation and current, unfunded benefits, no deduction is to be allowed under sec. 162 or 212 with respect to compensation or benefits except as provided under subchapter D of the Code

[20] See section 83(h)

[21] Sec 414(b), (c), and (m)

employer. In addition, as under the rules for qualified pension plans, an individual is to be considered an employee of an employer if the individual is a common-law employee or if the individual is a leased employee.

### *Effective Date*

Generally, the provisions of the bill will apply to contributions paid after March 31, 1984. In the case of a plan maintained under a collective bargaining agreement ratified by March 1, 1984, however, the provision applies to contributions paid after the later of December 31, 1986, or the date on which the collective bargaining agreement of the employer terminates (determined without regard to any extension thereof agreed to after March 31, 1984).

The bill includes a provision designed to prevent an amendment of a plan, made solely to conform to the new requirements, from being treated as a termination that would advance the effective date. This type of non-termination rule is similar to provisions included in the Employee Retirement Income Security Act of 1974 and subsequent legislation. It is not intended to create any inference that a particular agreement would, but for the provision, be considered to be terminated.

**2. Treatment of Unfunded Deferred Benefits (sec. 112 of the bill and sec. 404(b) of the Code.)**

***Present Law***

Under present law, a deduction generally is allowed to an employer for a contribution paid under a nonqualified plan of deferred compensation in the taxable year of the employer in which ends the taxable year in which the contribution is includible in the employee's gross income if separate accounts are maintained.[22] These rules also apply to contributions under a method, as well as a plan, of deferring compensation and to independent contractors as well as employees.[22a] Under the rules for nonqualified plans, no deduction is allowed for an employer's contribution unless the contribution meets the usual requirements of the tax law for deductibility (for example, the item must be an ordinary and necessary business expense or an expense with respect to property held for the production of income).

***Reasons for Change***

The committee is concerned that an employer may promise to provide an employee or independent contractor with a benefit some time in the future and, even though the benefit is not funded, may claim a deduction before the benefit is provided to the employee. Accordingly, the committee has concluded that it is appropriate to provide that if the benefit or other compensation is provided under a plan, method, arrangement, or similar understanding that a benefit will be provided in the future, it will be treated as provided under a plan deferring the receipt of compensation.

In addition, the committee is concerned that there is uncertainty about which of the deduction-timing rules of the Code applies with respect to benefits and the scope of these rules insofar as they affect compensation for services provided by independent contractors.. The committee wishes to emphasize that the special rules governing employer deductions with respect to funded welfare benefit plans, deferred compensation, and other deferred benefits, are provided in lieu of the general deduction-timing rules of the Code relating to compensation and that their applicability should be carefully considered in all cases involving the timing of deductions with respect to compensation for services.

***Explanation of Provision***

The bill clarifies the distinction between welfare benefits and deferred compensation. Under the bill, any plan providing for de-

[22] Sec 404(a)(5)
[22a] Sec. 404 (b) and (d)

ferred benefits for employees, their spouses, or their dependents is to be treated as a plan deferring the receipt of compensation. The test is to be applied by determining whether a benefit would, if considered to be compensation, be considered to be deferred compensation. A benefit that would be considered deferred compensation under this test is a deferred benefit. Of course, the determination of whether a plan defers the receipt of compensation is to be made without regard to any income tax rules excluding the benefit from gross income.

A funded welfare benefit plan would not be considered a plan of deferred compensation. A plan is not to be considered funded merely because the employer has purchased a benefit for employees. For example, a plan under which an employer makes a direct payment to an insurance company to purchase insurance benefits would not generally be considered a funded plan. On the other hand, if an employer makes a direct payment to an insurance company under a plan, pursuant to a typical "administrative services only" agreement under which the insurance company maintains a separate account to provide benefits, then the plan would be considered to be a funded plan because the benefits are purchased by the fund under the agreement.

An unfunded deferred benefit plan would be considered to be a plan of deferred compensation for purposes of the rules relating to the timing and amount of employer deductions for contributions. For example, if a plan provided that current employees will be entitled to life insurance protection after retirement, the benefit would be considered to be deferred compensation with respect to current employees under the bill because, as to those employees, it will not be provided until after retirement.

On the other hand, if a plan only provides current benefits for employees, the plan would not be considered a deferred compensation plan merely because it is expected that the plan will continue in existence. The benefit under such a plan with respect to future service will not be provided if the plan is terminated before that service is performed.

Of course, the provision does not change the tax treatment of the employee with respect to the benefit.

The bill clarifies current law by providing that an arrangement for compensation having the effect of a plan or method deferring the receipt of compensation does not have to be similar to a stock bonus, pension, profit-sharing, or annuity plan to be subject to the deferred compensation deduction-timing rules (sec. 404). Generally, all compensation arrangements which defer receipt of compensation by the employee or independent contractor will be subject to these special deduction-timing rules. For example, under the bill, a limited partnership that uses the accrual method of accounting may not accrue deductions for compensation owed to cash-method taxpayers, who perform services for the partnership, until the partnership taxable year in which such compensation is paid. This rule is consistent with current law, under which amounts of compensation deferred under an employment contract or year-end bonuses declared by a corporate board of directors, but not paid within a brief period of time after the close of the taxable year, are subject to the deduction-timing rules of section 404 to the extent that an-

other Code provision (e.g., sec. 267(a)(2)) does not operate to deny the deduction. However, the committee does not intend that a situation in which the compensation is unconditionally payable in the year the services are performed, but payment is unexpectedly delayed for a brief period of time due to the temporary financial condition of the payor, is to be treated as a deferred compensation arrangement.

It is intended that the Treasury Department will prescribe rules for the application of the exception from application of the deduction-timing rule for accrued compensation paid within a brief time after the close of the taxable year. Even if paid within a brief period of time after the close of the taxable year, a compensation arrangement will be subject to the deduction-timing rules of section 404 unless the delay is consistent with typical payroll practices or is attributable to a temporary shortage of funds which could not reasonably be expected.

### *Effective Date*

The provision applies to amounts paid or incurred after March 31, 1984, in taxable years ending after that date.

### 3. Additional Requirements for Tax-Exempt Status of Certain Organizations (sec. 113 of the bill and sec. 505 of the Code)

#### Present Law

***Voluntary employees' beneficiary associations (VEBAs)***

*Statutory requirements*

The Code describes VEBAs in the following broad terms: "Voluntary employees' beneficiary associations providing for the payment of life, sick, accident, or other benefits to the members of such association or their dependents or designated beneficiaries, if no part of the net earnings of such association inures (other than through such payments) to the benefit of any private shareholder or individual."

The tax exempt status of a VEBA does not directly affect either (1) the timing or amount of an employer's deduction for contributions to the VEBA or (2) the timing or amount of the inclusion in income of a welfare benefit provided to an employee under a plan. Many VEBAs provide benefits to employees that are excluded from gross income under a specific statutory provision.

*Eligibility for membership*

Under the regulations, membership in a VEBA must consist of individuals whose eligibility is determined by reference to objective standards that constitute an employment-related common bond. Such a common bond is deemed to exist if eligibility is determined by the following standards: (1) employment by a common employer (or affiliated employers), (2) coverage under one or more collective bargaining agreements, (3) membership in a labor union (or in one or more locals of a national or international labor union), or (4) employment by one of more employers in the same line of business in the same geographic locale. Under these standards, for example, a group of car dealers in the same city or other similarly restricted discrete geographical locale could form a VEBA to provide permissible benefits to their employees.

Membership in a VEBA generally is limited to employees. Under the regulations, the term employee means an individual who has a legal and bona fide relationship of employer and employee (e.g., for employment tax purposes or for purposes of a collective bargaining agreement). An individual is treated as an employee, however, whether or not the individual is a common-law employee, a retired employee, or a surviving spouse and dependents of an employee. A self-employed individual (and spouse and dependents) may be a member in a VEBA (i.e., the regulations deem such an individual to share an employment-related common bond with the individual's employees) provided 90 percent of the membership, on one day of

each quarter of the VEBA's taxable year, consists of individuals who are employees.

The regulations provide that membership in a VEBA must be voluntary, which requires an affirmative action by the employee to become a member. An employer may automatically include employees provided no detriment is incurred (e.g., deductions from pay) as a result of membership. Such a detriment can be incurred, however, if membership is imposed pursuant to a collective bargaining agreement or incident to membership in a labor organization.

Under present law, membership in a VEBA may not be limited to one employee.

*Association of employees*

A VEBA is not considered an association of employees unless the organization is controlled by (1) the membership, (2) independent trustees, or (3) trustees at least some of whom are designated by, or on behalf of, the membership. The regulations provide that a VEBA is treated as being controlled by independent trustees if it is an "employee welfare benefit plan" under the Employee Retirement Income Security Act of 1974 (ERISA). ERISA subjected employee welfare benefit plans to certain reporting and disclosure requirements and minimum fiduciary standards. If these standards are satisfied, the employer (or an officer of the employer) may serve as trustee of the VEBA.

*Permissible benefits*

In general, a VEBA may provide life [23], sick, accident [24], or other benefits in cash or in kind to members or their dependents or beneficiaries.

The regulations specify that "other" benefits means benefits similar to life, sick, or accident benefits. Under the regulations, such benefits must either (1) be intended to safeguard or improve the health of a member or a member's dependents or (2) protect against a contingency that interrupts or impairs a member's earning power. The following benefits are permissible "other" benefits that the regulations permit a VEBA to provide: (1) vacation benefits, (2) vacation facilities, (3) reimbursed vacation expenses, (4) subsidized recreational activities, (5) child care facilities for pre-school and school age dependents, (6) job readjustment allowances, (7) income maintenance payments in the event of economic dislocation, (8) temporary living expense loans and grants at times of disaster (such as fire or flood), (9) supplemental unemployment com-

---

[23] A life benefit means a benefit payable, directly or through insurance, by reason of the death of a member or dependent Although a life benefit may not include any benefit in the nature of a pension or annuity, it may be settled in the form of an annuity rather than a lump sum

[24] Under the regulations, sick and accident benefits mean amounts furnished in the event of illness or personal injury of a member or dependent, including amounts paid to a member in lieu of income during a period in which a member is unable to work because of sickness or injury (i e , disability income) Sick benefits also include benefits designed to safeguard or improve the health of members and their dependents and benefits furnished in noncash form, such a benefits in the nature of clinical care services by visiting nurses and transportation furnished for medical care

pensation benefits [25], (10) severance benefits [26], (11) personal legal services [27], and (12) any benefit provided in the manner permitted under section 302(c)(5) et seq. of the Labor Management Relations Act of 1947.

Impermissible VEBA benefits under the regulations include the following: (1) commuting expenses, (2) accident or homeowner's insurance benefits for damage to property, (3) malpractice insurance, (4) loans to members (other than distress loans), (5) savings facilities, and (6) any benefit similar to a pension or annuity payable at the time of mandatory or voluntary retirement or any benefit similar to a benefit provided by a profit-sharing or stock bonus plan.[28]

A VEBA benefit is considered to be similar to a pension or retirement benefit if it becomes payable by reason of the passage of time, rather than as the result of an unanticipated event. Severance pay benefits, which can operate in many ways like deferred compensation benefits, are becoming increasingly popular VEBA benefits. In some cases, severance pay benefits have been designed to provide cost-of-living adjustments and actuarial reductions for severance prior to attainment of a specified age. It has been suggested that such benefits more closely resemble pension benefits than severance pay benefits.

*Nondiscrimination requirements*

The VEBA rules of the Code provide that no part of the net earnings of the VEBA may inure, other than through the payment of permissible benefits, to the benefit of any private shareholder or individual. In general, the proscription is designed to ensure that tax-exempt status will be retained only if the organization is operating for tax-exempt purposes, rather than for the benefit of private individuals. Under the VEBA regulations, a VEBA violates this prohibition against inurement if it does not meet certain nondiscrimination standards.

Under the regulations, eligibility criteria for VEBA membership may not be established or administered in a manner that limits membership to officers, shareholders, or highly compensated employees. Similarly, benefits provided by a VEBA cannot be limited to officers, shareholders, or highly compensated employees and cannot disproportionately favor these employees. Generally, this test is not failed merely because certain benefits (such as life insurance) are provided as a uniform percentage of compensation. Also, the regulations permit disability benefits to be integrated (i.e., reduced) on account of social security disability benefits or any "similar plan."[29]

Upon termination of a VEBA, no assets may revert to employers who have contributed to the VEBA. Thus, the assets must be used

---

[25] See I R C section 501(c)(17).

[26] Such benefits must constitute a severance pay plan within the meaning of Department of Labor Regs. section 2510 3-2(b)

[27] See I.R.C section 501(c)(20)

[28] Treas Reg sec 1.501(c)(9)-3(f) The Tax Court specifically upheld the validity of this provision (and sec. 1 501(c)(9)-3(d)) in *Bricklayers Benefit Plans of Delaware Valley, Inc. v Commissioner*, 81 T C 735 (1983).

[29] Integration with social security apparently has been attempted by some plans even though the employee is covered under a pension plan of the employer that is also integrated with social security

to purchase permissible benefits in a manner that does not result in prohibited discrimination. Under the regulations, the assets can be distributed on the basis of objective and reasonable standards that do not result in either unequal payments to similarly situated members or disproportionate payments to the officers, shareholders, or highly compensated employees. If the only members remaining upon termination of the VEBA are officers, shareholders, or highly compensated employees, prohibited discrimination may not result if the assets are distributed to these members in the form of permissible benefits.

*Supplemental unemployment compensation benefit trusts*

Prior to 1960, supplemental unemployment compensation benefits generally were funded by the employer through a VEBA. Employers generally could not advance fund these benefits because of the limitation on investment income then provided by section 501(c)(9). Consequently, for taxable years beginning after 1959, Congress provided a tax exemption for a trust designed primarily to provide supplemental unemployment benefits to employees.[30]

Present law provides that a trust forming part of a plan providing for the payment of supplemental unemployment compensation benefits is eligible for tax exemption if (1) it is impossible, at any time prior to the satisfaction of all liabilities, for any part of the assets of the trust to be used for the purpose of providing other than unemployment compensation benefits, (2) the employees eligible for the benefits satisfy a classification that does not discriminate in favor of employees who are officers, shareholders, supervisors, or highly compensated employees, and (3) the benefits provided do not discriminate in favor of officers, shareholders, supervisors, or highly compensated employees.

Supplemental unemployment compensation benefits means (1) benefits that are paid to an employee because of involuntary separation from employment with the employer (whether or not temporary) resulting directly from a reduction in force, the discontinuance of a plant or operation, or other similar conditions, and (2) sick and accident benefits that are subordinate to the supplemental unemployment benefits.

In determining whether a supplemental unemployment compensation benefits trust is nondiscriminatory, present law provides that discrimination does not exist merely because the benefits received under the plan bear a uniform relationship to compensation. Similarly, a plan is not discriminatory merely because the benefits under the plan are reduced by a sick, accident, or unemployment benefit received under state or Federal law or merely because eligibility for the benefits is limited to employees who are not eligible for sick, accident, or unemployment benefits under state or Federal law.

*Qualified group legal services organization*

Under present law, an organization created or organized exclusively to form part of a group legal services plan (within the meaning of sec. 120) may be entitled to tax exemption.

[30] I.R.C. sec. 501(c)(17)

### *Reasons for Change*

The committee believes that employee benefits funded through a tax exempt organization should not be allowed to discriminate in favor of the employees who influence the design of the benefit plan. The committee is concerned that the rules of present law prohibiting discrimination are not sufficiently clear to prevent abuse of the tax-exempt status provided for voluntary employees' beneficiary associations.

The committee is also concerned that the recent proliferation of tax-exempt organizations used to fund employee benefits has made it increasingly difficult for the Internal Revenue Service to monitor the compliance of these entities with the applicable exemption requirements. Accordingly, the committee believes that it is appropriate to require voluntary employees' beneficiary associations and supplemental unemployment compensation benefit trusts to provide notice of a claim to exempt status.

### *Explanation of Provision*

#### *In general*

An association that is otherwise exempt from tax as a voluntary employees' beneficiary association (VEBA) or group legal services organization would not continue to be tax exempt unless it meets new standards provided by the bill. These standards provide more effective rules prohibiting discrimination in favor of highly compensated employees and limit the portion of a benefit that may be used by highly compensated employees. Under the bill, the rules aggregating employees of related employers for purposes of testing qualified pension plans apply (with modifications) in testing VEBAs. Similarly, under the bill, all plans and funds of the employer (and related employers) are to be aggregated. The utilization standard also applies to a supplemental unemployment compensation benefit trust (SUB).

An employee is considered highly compensated if the employee is highly compensated under the rules for medical reimbursement plans (sec. 105(h) (except that an employee is not considered highly compensated on account of the level of compensation unless the employee is among the highest paid 10 percent (rather than 25 percent) of all employees (other than certain excluded employees).

#### *Utilization*

The bill provides that no more than 25 percent of a benefit funded by a VEBA during a year may be provided to highly compensated employees. For purposes of the 25-percent test, each class of benefit funded by a VEBA is to be considered separately. For example, medical benefits, life insurance,[31] disability insurance, severance pay, and recreational facilities would each be considered to be a separate class of benefits and each would be tested separately for utilization. In the case of certain benefits, such as medical benefits, the 25-percent test is to be applied to the coverage, or right to cash or in-kind benefits, provided to employees, rather than to the

[31] Accident insurance could be combined with either life insurance or medical benefits

actual payments or claims made. Thus, for example, if all employees are entitled to equal benefits, then the 25-percent test is applied by allocating to each eligible employee an equal share of the total cost of such benefits.

The committee expects that, in the case of recreational facilities and other benefits that are includible in gross income and that are subject to withholding tax, Treasury regulations will require that utilization be demonstrated by withholding under rules similar to those provided under section 83.

***Nondiscrimination***

In general, a VEBA meets the nondiscrimination standards of the bill only if, under the plan of that it is a part, (1) each class of benefits is available to employees under a classification which is set forth in the plan and that is found by the Treasury not to be discriminatory in favor of employees who are highly compensated, and (2) such class of benefits provided does not discriminate in favor of highly compensated employees. In testing whether the benefits are available to a nondiscriminatory classification of employees, employees who decline to make required contributions must be considered.

Under the bill, however, if a plan provides a benefit of a type for which a nondiscrimination standard is provided by the Code as a condition of an exclusion from gross income, that benefit is not subject to the general nondiscrimination standard. Such a benefit will be considered to be nondiscriminatory if and only if it meets the nondiscrimination standard of the applicable provision of the Code. For example, benefits provided under a medical reimbursement plan would meet the nondiscrimination standard under a VEBA if, and only if, they meet the nondiscrimination standard provided for such plans by section 105(h)(3) and (4).

The bill overrides the nondiscrimination rules of present law for those VEBAs subject to the rules of the bill. The nondiscrimination standards of the bill do not apply to a VEBA maintained pursuant to a collective bargaining agreement. Of course, such VEBAs continue to be subject to the nondiscrimination standards of present law.

In determining whether the nondiscrimination standards are satisfied, the committee intends that the Secretary may take into consideration benefits that vary on account of reasonable and significant geographic disparities.

As under present law, the nondiscrimination standards are applicable with respect to the form of a plan (or exempt organization), its operation, and its termination.

Under the nondiscrimination standard for benefits provided by a VEBA, a life, disability, severance pay, and supplemental unemployment compensation benefit is not considered to be discriminatory merely because the benefit bears a uniform relationship to the total compensation, or to the basic or regular rate of compensation, of covered employees. Generally, such a benefit could not be integrated with social security benefits or benefits under a qualified plan or a simplified employee pension. In the case of a disability benefit, however, integration with the employer-provided portion of social security disability benefits (or contributions) is allowed to the

extent employer-provided social security disability benefits (or contributions) are not taken into account under a qualified pension, profit-sharing, or stock bonus plan, or under a simplified employee pension.

### *Notice of claim of exempt status*

Under the bill. a VEBA or SUB would be required to notify the Internal Revenue Service that it is applying for recognition of its exempt status. The committee believes that such notice is required for efficient administration of the tax law. Organizations that have previously notified the IRS are not required, under the bill, to renotify the IRS.

Under the bill. an organization is not exempt as a VEBA or a SUB unless it has given the notice in the manner required by Treasury regulations. The organization will not be exempt as a VEBA or a SUB for any period before the notice is given if the notice is given after the time prescribed by the regulations. In the case of an organization that is in existence on March 31, 1984, the time for giving the notice is not to expire before the end of 1 year after the date of enactment.

### *Related employers, etc.*

The bill provides that, in testing a VEBA, rules similar to the rules of secs. 414(b), (c), (m), and (n) apply. In addition, under these rules, all plans and funds (within the meaning of sec. 419(e)) maintained by an employer (or related employers) are aggregated.

### *Supplemental unemployment compensation benefits*

Under the bill, the special and utilization test, will apply to a supplemental unemployment compensation benefit trust.[32]

### *Group legal service organizations*

Under the bill, all of the new rules applicable to a VEBA will apply to a group legal service organization.

## *Effective date*

These provisions of the bill apply for taxable years beginning after December 31, 1984.

---

[32] Sec. 501(c)(17)

### 4. Amendments to Tax on Unrelated Business Income (sec. 114 of the bill and sec. 512 of the Code.)

#### *Present Law*

Under present law, tax-exempt organizations generally are subject to income taxes on income from an unrelated trade or business. In the case of a voluntary employees' beneficiary association (VEBA), income of the association generally is not subject to the tax on unrelated business income to the extent the income is "set aside" to provide permissible benefits. Present law does not specifically limit the amount of income that can be set aside.

#### *Reasons for Change*

The committee believes that there should be reasonable limits on the extent to which a tax-exempt entity, such as a voluntary employees' beneficiary association (VEBA) or supplemental unemployment compensation benefit trust (SUB), may accumulate income, tax-free. Also, the committee believes that tax-exempt accumulations should not be permitted for certain benefits that may be provided under a VEBA or SUB. Accordingly, the committee believes that it is appropriate to impose reasonable limits on the amounts that may be set aside on a tax-exempt basis, and that reserves should not be allowed except with respect to self-funded life, sickness, accident, severance pay, supplemental unemployment compensation benefits, and group legal services.

#### *Explanation of Provision*

The bill provides that a voluntary employees' beneficiary association (VEBA), a supplemental unemployment compensation benefit trust (SUB) or a group legal service organization may set aside assets, tax free, only for the purpose of providing for the payment of life, accident, sickness, severance pay, supplemental unemployment compensation, or group legal service benefits. Under the bill, the amount set aside, tax free, for these purposes is not to exceed the level of the qualified asset account determined under the rules relating to deductions for contributions to the VEBA, etc.

The committee intends that regulations will provide a method for allocating any unrelated business income among employers contributing to a VEBA, etc.

#### *Effective Date*

The provision applies to taxable years beginning after December 31, 1984.

### 5 Employer and Employee Benefit Association Treated as Related Persons under Section 1239 (sec 115 of the bill and sec 1239 of the Code )

#### *Present Law*

Under present law the gain from the sale of depreciable property between certain related taxpayers is treated as ordinary income The rules of present law do not treat an employer and the exempt benefit organization to which the employer contributes as related parties

#### *Reasons for Change*

The committee is concerned that employers may be encouraged to assign inappropriate values to property contributed to an employer controlled fund under a funded welfare benefit plan Accordingly the committee believes that it is appropriate to treat such a transaction as a transaction between related parties and thus any gain realized by the employer would be treated as ordinary income instead of capital gain

#### *Explanation of Provision*

Under the bill certain exempt organizations would be treated as related parties with respect to an employer under the rules of the Code treating gain on certain transactions as ordinary income The bill provides that an employer (and any person related to the employer) would be considered to be related to an exempt social club voluntary employees beneficiary association supplemental unemployment compensation benefit trust or a group legal service organization (secs 501(c)(7) (9) (17) or (20)) which is controlled directly or indirectly by the employer by a person related to the employer or by the employer and a person related to the employer

#### *Effective Date*

The provision would apply to sales or exchanges after December 31 1984 in taxable years ending after that date



31 409 O - 84 - 83 BK 1