98TH CONGRESS
2d Session

HOUSE OF REPRESENTATIVES

REPORT
98-861

# DEFICIT REDUCTION ACT OF 1984

---

THE COMMITTEE OF CONFERENCE

SUBMITTED THE FOLLOWING

## CONFERENCE REPORT

[To accompany H.R. 4170]

JUNE 23, 1984.—Ordered to be printed

---

U.S GOVERNMENT PRINTING OFFICE
35-426 O
WASHINGTON · 1984

98TH CONGRESS 2d Session | HOUSE OF REPRESENTATIVES | REPORT 98-861

# DEFICIT REDUCTION ACT OF 1984

JUNE 23, 1984.—Ordered to be printed

Mr. ROSTENKOWSKI, from the committee of conference, submitted the following

# CONFERENCE REPORT

[To accompany H.R. 4170]

The committee of conference on the disagreeing votes of the two Houses on the amendment of the House to the amendments of the Senate to the bill (H.R. 4170) to provide for tax reform, and for other purposes, having met, after full and free conference, having agreed to recommend and do recommend to their respective Houses as follows:

That the Senate recede from its disagreement to the amendment of the House to the amendment of the Senate to the text of the bill and agree to the same with an amendment as follows:

In lieu of the matter proposed to be inserted by the House amendment insert the following:

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

***SECTION 1. SHORT TITLE.***

*(a) SHORT TITLE.—This Act may be cited as the "Deficit Reduction Act of 1984".*

*(b) ACT DIVIDED INTO 2 DIVISIONS.—This Act consists of 2 divisions as follows:*

*(1) DIVISION A.—Tax Reform Act of 1984.*

*(2) DIVISION B.—Spending Reduction Act of 1984.*

## *DIVISION A—TAX REFORM ACT OF 1984*

***SEC. 5. SHORT TITLE, ETC.***

*(a) SHORT TITLE.—This division may be cited as the "Tax Reform Act of 1984".*

*(b) AMENDMENT OF 1984 CODE.—Except as otherwise expressly provided, whenever in this division an amendment or repeal is expressed in terms of an amendment to, or repeal of, a section or other*

35-426 O

*provision, the reference shall be considered to be made to a section or other provision of the Internal Revenue Code of 1954.*

***SEC. 10. TABLE OF CONTENTS.***

*Section 1. Short title.*

*DIVISION A—TAX REFORM ACT OF 1984*

*Sec. 5. Short title, etc.*

*TITLE I—TAX FREEZE, TAX REFORMS GENERALLY*

*Sec. 10. Table of contents.*

*Subtitle A—Deferral of Certain Tax Reductions*

*PART I—INCOME TAX PROVISIONS*

*Sec 11. Amount of used property eligible for investment tax credit*
*Sec. 12. Finance lease provisions*
*Sec 13 Election to expense certain depreciable business assets.*
*Sec. 14. Employee stock ownership credit.*
*Sec. 15. Cost-of-living adjustments in pension plan limitations*
*Sec. 16 Repeal of partial interest exclusion.*
*Sec. 17. Foreign earned income of individuals*
*Sec. 18 Effective date.*

*PART II—ESTATE AND GIFT TAX RATES*

*Sec. 21. Maximum rate*

*PART III—EXCISE TAXES*

*Sec. 25 Tax rate on newly discovered oil.*
*Sec. 26 Excise tax on communications services*
*Sec. 27 Excise tax on distilled spirits*

*Subtitle B—Tax-Exempt Entity Leasing*

*Sec. 31. Denial of tax incentives for property leased to governments and other tax-exempt entities*
*Sec. 32. Motor vehicle operating leases*

*Subtitle C—Treatment of Bonds and Other Debt Instruments*

*Sec 41. Treatment of bonds and other debt instruments.*
*Sec. 42. Technical and conforming amendments related to original issue discount changes.*
*Sec. 43. Technical and conforming amendments related to treatment of market discount and acquisition discount*
*Sec. 44. Effective dates*

*Subtitle D—Corporate Provisions*

*PART I—LIMITATIONS ON DIVIDENDS RECEIVED DEDUCTION*

*Sec. 51 Dividends received deduction reduced where portfolio stock is debt financed.*
*Sec. 52. Treatment of dividends from regulated investment companies.*

*PART II—TREATMENT OF CERTAIN DISTRIBUTIONS*

*Sec. 53. Corporate shareholder's basis in stock reduced by nontaxed portion of extraordinary dividends*
*Sec. 54. Distribution of appreciated property by corporations*
*Sec 55. Extension of holding period for losses attributable to capital gain dividends of regulated investment companies or real estate investment trusts.*

*PART III—MISCELLANEOUS PROVISIONS*

*Sec 56 Denial of deductions for certain expenses incurred in connection with short sales*
*Sec 57. Nonrecognition of gain or loss by corporation on options with respect to its stock*
*Sec 58. Amendments to accumulated earnings tax.*
*Sec. 59 Repeal of stock for debt exceptions for purposes of determining income from discharge of indebtedness*

Sec. 60 Affiliated group defined
Sec. 61 Provisions relating to earnings and profits.
Sec. 62 2-year delay in application of the net operating loss rules added by the Tax Reform Act of 1976.
Sec 63. Target corporation must distribute assets after reorganization described in section 368(a)(1)(C).
Sec 64 Definition of control for purposes of nondivisive reorganizations under section 368(a)(1)(D)
Sec. 65 Collapsible corporations
Sec. 66 Phase-out of graduated rates for large corporations
Sec 67 Restrictions on golden parachute payments
Sec 68 Increase in reduction in certain corporate preference items from 15 percent to 20 percent

*Subtitle E—Partnership Provisions*

Sec 71 Partnership allocations with respect to contributed property
Sec 72 Determination of distributive shares when partner's interest changes
Sec 73 Payments to partners for property or certain services
Sec 74 Contributions to a partnership of unrealized receivables, inventory items, or capital loss property
Sec 75 Transfers of partnership and trust interests by corporations
Sec 76 Application of section 751 in the case of tiered partnerships
Sec 77 Section 1031 not applicable to partnership interests, limitation on the period during which like kind exchanges may be made.
Sec 78. Elimination of basis strips under section 734(b)
Sec 79. Overruling of Raphan case

*Subtitle F—Trust Provisions*

Sec. 81. Treatment of property distributed in kind
Sec 82 Treatment of multiple trusts

*Subtitle G—Accounting Changes*

Sec 91. Certain amounts not treated as incurred before economic performance
Sec 92 Treatment of certain deferred payments for use of property or services.
Sec. 93. Amortization of construction period interest and taxes for residential real property held by corporations.
Sec 94 Capitalization of start-up expenditures
Sec 95 LIFO conformity rules applied on controlled group basis.

*Subtitle H—Provisions Relating to Tax Straddles*

Sec 101. Repeal of exception from straddle rules for stock options and certain stock.
Sec 102 Section 1256 extended to certain options.
Sec 103 Regulations under section 1092(b)
Sec 104 Limitation on losses from hedging transactions
Sec 105 Clarification that section 1234 applies to options on regulated futures contracts and cash settlement options
Sec. 106. Wash sale rules to apply to losses on certain short sales
Sec 107 Time for identification by taxpayer of certain transactions.
Sec. 108. Treatment of certain losses on straddles entered into before effective date of Economic Recovery Tax Act of 1981.

*Subtitle I—Depreciation*

Sec 111 Recovery period for certain real property extended to 18 years.
Sec 112 Recapture in case of installment sales
Sec 113 Provisions relating to sound recordings and films
Sec 114. Definition of section 38 property in sale-leaseback transactions

*Subtitle J—Foreign Provisions*

*PART I—CHANGES IN SOURCE AND CHARACTER RULES*

Sec 121 Certain amounts treated as derived from United States sources for purposes of limitation on foreign tax credit
Sec 122 Certain amounts treated as interest for purposes of the limitation on the foreign tax credit
Sec. 123. Treatment of related person factoring income

*Sec. 124. Treatment of certain transportation income*
*Sec. 125. Treatment of certain distributions received by United States-owned foreign corporations*
*Sec. 126. Allocation under section 861 of research and experimental expenditures*

*PART II—WITHHOLDING PROVISIONS*

*Sec. 127. Repeal of 30 percent tax on interest received by foreign persons on certain portfolio investments*
*Sec. 128. Treatment of United States source original issue discount in case of foreign persons*
*Sec. 129. Withholding of tax on dispositions of United States real property interests*
*Sec. 130. Treatment of payments to Guam and Virgin Islands corporations.*

*PART III—TAXATION OF CERTAIN TRANSFERS OF PROPERTY OUTSIDE THE UNITED STATES*

*Sec 131. Taxation of certain transfers of property outside the United States.*

*PART IV—MISCELLANEOUS FOREIGN CORPORATE PROVISIONS*

*Sec. 132. Amendments related to foreign personal holding companies.*
*Sec. 133. Amendments related to section 1248.*
*Sec 134. Definition of foreign investment company*
*Sec 135. Application of collapsible corporation rules to foreign corporations*
*Sec. 136. Stapled stock; stapled entities.*
*Sec. 137. Services relating to insurance policies are treated as performed in country of risk*

*PART V—TREATMENT OF ALIEN INDIVIDUALS*

*Sec. 138. Definition of resident alien and nonresident alien*
*Sec. 139. Treatment of community income*

*Subtitle K—Reporting, Penalty, and Other Provisions*

*PART I—PROVISIONS RELATING TO TAX SHELTERS*

*Sec. 141. Registration of tax shelters*
*Sec. 142. Organizers and sellers of potentially abusive tax shelters must keep lists of investors*
*Sec. 143. Increase in penalty for promoting abusive tax shelters; injunction against aiding or abetting understatement of tax liability*
*Sec. 144. Increased rate of interest on substantial underpayments attributable to certain tax motivated transactions.*

*PART II—INFORMATION REPORTING PROVISIONS*

*Sec. 145 Returns relating to mortgage interest received in trade or business from individuals*
*Sec 146 Returns relating to cash received in trade or business*
*Sec 147. Provisions relating to individual retirement accounts*
*Sec. 148. Returns relating to foreclosures and abandonments of security.*
*Sec 149. Returns relating to exchanges of partnership interests where unrealized receivables, etc, involved*
*Sec 150. Statements required in case of certain substitute payments.*
*Sec 151. Reporting of State and local refunds not required with respect to non-itemizers.*
*Sec. 152. Furnishing of TIN under backup withholding*

*PART III—OTHER COMPLIANCE PROVISIONS*

*Sec 155 Substantiation of charitable contributions, modifications of incorrect valuation penalty.*
*Sec 156. Authorization to disregard appraisals of persons penalized for aiding in understatements of tax liability*
*Sec. 157. Limitation on mailing of deposits of taxes.*
*Sec. 158. Interest on certain additions to tax*
*Sec. 159. Penalty for fraudulent withholding exemption certificate or failure to supply information.*
*Sec. 160. Application of penalty for frivolous proceedings to pending Tax Court proceedings.*
*Sec. 161. Failure to request change of method of accounting.*

Sec. 162 Clarification of change of venue for certain tax offenses.
Sec. 163. Extension of statute of limitations with respect to certain expenditures relating to contributions in aid of construction.

*Subtitle L—Miscellaneous Provisions*

Sec. 171. Inclusion of tax benefit items in income.
Sec 172 Loans with below-market interest rates.
Sec. 173 Eligibility for income averaging.
Sec 174. Amendments to section 267.
Sec. 175. Amendments to section 1239.
Sec. 176 Recapture of net ordinary losses under section 1231.
Sec 177. Repeal of exemption from Federal tax of the Federal Home Loan Mortgage Corporation.
Sec. 178. Special rule relating to sales or exchanges of certain economic interests in coal between related parties
Sec. 179. Limitation on amount of depreciation and investment tax credit for luxury automobiles, limitation where certain property used for personal purposes.

*TITLE II—LIFE INSURANCE PROVISIONS*

Sec. 201 Table of sections for part I of subchapter L.

*Subtitle A—Taxation of Life Insurance Companies*

*PART I—AMENDMENT OF SUBCHAPTER L*

Sec 211. Amendment of subchapter L.
Sec 212. Certain reinsurance agreements.

*PART II—EFFECTIVE DATE; TRANSITIONAL RULES*

*SUBPART A—EFFECTIVE DATE*

Sec 215 Effective date.

*SUBPART B—TRANSITIONAL RULES*

Sec. 216 Reserves computed on new basis; fresh start.
Sec. 217. Other special rules.
Sec 218. Underpayments of estimated tax for 1984.

*Subtitle B—Taxation of Life Insurance Products*

Sec. 221. Definition of life insurance contract.
Sec. 222 Treatment of certain annuity contracts.
Sec. 223. Group-term life insurance purchased for employees.
Sec. 224. Treatment of certain exchanges of insurance policies.

*Subtitle C—Studies*

Sec. 231. Studies.

*TITLE III—REVISION OF PRIVATE FOUNDATION PROVISIONS*

Sec 301. Limitations on deduction for contributions to private foundations.
Sec 302. Exemption for certain operating foundations from excise tax on investment income.
Sec. 303 Reduction in excise tax on investment income where private foundation meets certain distribution requirements
Sec. 304. Amendment to taxes on failure to distribute income.
Sec. 305. Abatement of first tier taxes in certain cases.
Sec 306. Miscellaneous amendments
Sec 307. 5-year extension of requirement to dispose of certain excess holdings attributable to large gifts and bequests.
Sec. 308 Decreases attributable to stock issuances not to reduce permitted percentage of holdings where decrease is 2 percent or less.
Sec. 309. Aggregation of stock holdings of private foundation and disqualified persons in applying 95 percent ownership test.
Sec. 310. 5-year period to dispose of excess holdings resulting from certain acquisitions by disqualified persons.
Sec. 311. The conducting of certain games of chance not treated as unrelated trade or business.

*Sec 312. Tax on self-dealing not to apply to certain stock purchases.*
*Sec. 313. Person ceases to be substantial contributor after 10 years with no connection to foundation*
*Sec. 314. Technical amendments.*

*TITLE IV—TAX SIMPLIFICATION*

*Subtitle A—Revision and Simplification of Estimated Income Tax for Individuals*

*Sec. 411. Revision of penalty for failure to pay estimated income tax.*
*Sec. 412 Repeal of requirement of declarations, etc*
*Sec. 413. Crediting of income tax overpayment against estimated tax liability*
*Sec. 414. Effective dates.*

*Subtitle B—Domestic Relations*

*Sec 421 Treatment of transfers of property between spouses or incident to divorce.*
*Sec 422. Tax treatment of alimony and separate maintenance payments.*
*Sec. 423 Dependency exemption in the case of child of divorced parents, etc.*
*Sec. 424. Innocent spouse relieved of liability in certain cases*
*Sec 425. Treatment of certain property settlements for purposes of estate and gift taxes*
*Sec. 426. Income from sheltered workshops not taken into account in determining dependency exemption.*

*Subtitle C—Revision of At-Risk Rules*

*Sec 431 Revision of investment credit at-risk rules.*
*Sec. 432. Exclusion of active businesses of qualified C corporations from at-risk rules, etc*

*Subtitle D—Miscellaneous Treasury Administrative Provisions*

*PART I—PROVISIONS NOT RELATING TO DISTILLED SPIRITS TAX*

*Sec 441. Simplification of certain reporting requirements*
*Sec. 442 Removal of $1,000,000 limitation on working capital fund*
*Sec 443. Increase in limitation on revolving fund for redemption of real property.*
*Sec. 444 Removal of $1,000,000 limitation on special authority to dispose of obligations*
*Sec 445 Secretary of the Treasury authorized to accept gifts and bequests*
*Sec 446 Extension of period for court review of jeopardy assessment where prompt service not made on the United States*
*Sec. 447. Extension of period during which additional tax shown on amended return may be assessed*
*Sec. 448 Treatment of certain guaranteed drafts issued by financial institutions*
*Sec. 449. Disclosure of windfall profit tax information to State tax officials.*
*Sec 450 Financial reporting of investment tax credits.*

*PART II—PROVISIONS RELATING TO DISTILLED SPIRITS*

*Sec 451 Repeal of occupational tax on manufacturers of stills and condensers; notices of manufacture and set up of stills.*
*Sec. 452. Allowance of drawback claims even where certain requirements not met.*
*Sec 453 Disclosure of alcohol fuel producers to administrators of State alcohol laws.*
*Sec 454. Repeal of stamp requirement for distilled spirits.*
*Sec. 455. Cooking wine may be fortified using distilled spirits*
*Sec. 456 Effective dates*

*Subtitle E—Tax Court Provisions*

*Sec. 461 Increase in jurisdictional limit for small cases*
*Sec. 462. Annuities to survivors of Tax Court judges*
*Sec. 463. Proceedings which may be assigned to commissioners*
*Sec. 464 Special trial judges*
*Sec. 465 Publicity of Tax Court proceedings*

*Subtitle F—Simplification of Income Tax Credits*

*Sec. 471. Credits grouped together in more logical order*
*Sec 472 Uniform limitation on personal nonrefundable credits*
*Sec 473. Uniform carryover provisions for business-related credits.*
*Sec. 474. Technical and conforming amendments*

Sec. 475 Effective dates

Subtitle G—Miscellaneous Simplification Provisions

Sec 481 Preferred stock eligible under section 1244.
Sec 482 Medical care deduction allowed for lodging away from home in certain cases.

Subtitle H—Repeal of Certain Obsolete Provisions

Sec 491. Termination of rules relating to qualified bond purchase plans and retirement bonds with respect to bonds issued after December 31, 1983.
Sec 492 Repeal of rules relating to gains from disposition of property used in farming where farm losses offset nonfarm income.

TITLE V—EMPLOYEE BENEFIT PROVISIONS

Subtitle A—Welfare Benefit Plans

Sec. 511. Treatment of funded welfare benefit plans.
Sec. 512 Treatment of unfunded deferred benefits.
Sec. 513 Additional requirements for tax-exempt status of certain organizations.

Subtitle B—Provisions Relating to Pension Plans

Sec. 521. Required distributions.
Sec. 522 Rollover of certain partial distributions permitted.
Sec 523 Treatment of distributions where substantially all contributions are employee contributions.
Sec. 524. Provisions relating to top-heavy plans.
Sec 525 Repeal of estate tax exclusion for qualified pension plan benefits
Sec. 526 Affiliated service groups, employee leasing arrangements, and collective bargaining agreements
Sec. 527. Provisions relating to cash or deferred arrangements
Sec 528. Treatment of certain medical, etc., benefits under section 415.
Sec. 529 Certain alimony treated as compensation.

Subtitle C—Tax Treatment of Fringe Benefits

Sec. 531. Exclusion of certain fringe benefits from gross income.
Sec 532 Exclusion of certain reductions in tuition from gross income.

Subtitle D—Employee Stock Ownership Plans

Sec. 541 Nonrecognition of gain on stock sold to employee stock ownership plans or certain cooperatives if qualified replacement property acquired.
Sec 542. Deductibility of certain dividend distributions from employee stock ownership plans.
Sec. 543. Exclusion of interest on loans used to finance acquisition of employer securities by an ESOP.
Sec 544. Assumption of estate tax liability by employer stock ownership plan or cooperative receiving employer securities.
Sec. 545 Excise tax on certain dispositions of employer securities by employee stock ownership plans and certain cooperatives.

Subtitle E—Miscellaneous

Sec 551 Treatment of certain distributions from a qualified terminated plan.
Sec 552. Partial termination for certain pension plans
Sec 553. Distribution requirements for accounts and annuities of an insurer in a rehabilitation proceeding.
Sec. 554. Extension of time for repayment of qualified refunding loans.
Sec 555. Technical amendments to the incentive stock option provisions.
Sec 556 Time for making certain section 83(b) elections.
Sec 557 Employer and employee benefit association treated as related persons under section 1239.
Sec. 558 Elimination of retroactive application of amendments made by Multiemployer Pension Plan Amendments Act of 1980.
Sec 559. Telecommunication employees.
Sec 560. Study of employee welfare benefit plans.

# *TITLE V—EMPLOYEE BENEFIT PROVISIONS*

## *Subtitle A—Welfare Benefit Plans*

***SEC. 511. TREATMENT OF FUNDED WELFARE BENEFIT PLANS.***

*(a) GENERAL RULE.—Part I of subchapter D of chapter 1 (relating to pension, profit sharing, stock bonus plans, etc.) is amended by adding at the end thereof the following new subpart:*

## *"Subpart D—Treatment of Welfare Benefit Funds*

*"Sec 419 Treatment of funded welfare benefit plans*
*"Sec 419A Qualified asset account, limitation on additions to account*

***"SEC. 419. TREATMENT OF FUNDED WELFARE BENEFIT PLANS.***

*"(a) GENERAL RULE.—Contributions paid or accrued by an employer to a welfare benefit fund—*

*"(1) shall not be deductible under section 162 or 212, but*

*"(2) if they testify the requirements of either of such sections, shall (subject to the limitation of subsection (b)) be deductible under this section for the taxable year in which paid.*

*"(b) LIMITATION.—The amount of the deduction allowable under subsection (a)(2) for any taxable year shall not exceed the welfare benefit fund's qualified cost for the taxable year.*

*"(c) QUALIFIED COST.—For purposes of this section—*

*"(1) IN GENERAL.—Except as otherwise provided in this subsection, the term 'qualified cost' means, with respect to any taxable year, the sum of—*

*"(A) the qualified direct cost for such taxable year, and*

*"(B) subject to the limitation of section 419A(b), any addition to a qualified asset account for the taxable year.*

*"(2) REDUCTION FOR FUNDS AFTER-TAX INCOME.—In the case of any welfare benefit fund, the qualified cost for any taxable year shall be reduced by such fund's after-tax income for such taxable year.*

*"(3) QUALIFIED DIRECT COST.—*

*"(A) IN GENERAL.—The term 'qualified direct cost' means, with respect to any taxable year, the aggregate amount which would have been allowable as a deduction to the employer with respect to the benefits provided during the taxable year, if—*

*"(i) such benefits were provided directly by the employer, and*

*"(ii) the employer used the cash receipts and disbursements method of accounting.*

*"(B) TIME WHEN BENEFITS PROVIDED.—For purposes of subparagraph (A), a benefit shall be treated as provided when such benefit would be includible in the gross income of the employee if provided directly by the employer (or*

*would be so includible but for any provision of this chapter excluding such benefit from gross income).*

*"(C) 60-MONTH AMORTIZATION OF CHILD CARE FACILITIES.—*

*"(i) IN GENERAL.—In determining qualified direct costs with respect to any child care facility for purposes of subparagraph (A), in lieu of depreciation the adjusted basis of such facility shall be allowable as a deduction ratably over a period of 60 months beginning with the month in which the facility is placed in service.*

*"(ii) CHILD CARE FACILITY.—The term 'child care facility' means any tangible property which qualifies under regulations prescribed by the Secretary as a child care center primarily for children of employees of the employer; except that such term shall not include any property—*

*"(I) not of a character subject to depreciation; or*

*"(II) located outside the United States.*

*"(4) AFTER-TAX INCOME.—*

*"(A) IN GENERAL.—The term 'after-tax income' means, with respect to any taxable year, the gross income of the welfare benefit fund reduced by the sum of—*

*"(i) the deductions allowed by this chapter which are directly connected with the production of such gross income, and*

*"(ii) the tax imposed by this chapter on the fund for the taxable year.*

*"(B) TREATMENT OF CERTAIN AMOUNTS.—In determining the gross income of any welfare benefit fund—*

*"(i) contributions and other amounts received from employees shall be taken into account, but*

*"(ii) contributions from the employer shall not be taken into account.*

*"(5) ITEM ONLY TAKEN INTO ACCOUNT ONCE.—No item may be taken into account more than once in determining the qualified cost of any welfare benefit fund.*

*"(d) CARRYOVER OF EXCESS CONTRIBUTIONS.—If—*

*"(1) the amount of the contributions paid (or deemed paid under this subsection) by the employer during any taxable year to a welfare benefit fund, exceeds.*

*"(2) the limitation of subsection (b),*

*such excess shall be treated as an amount paid by the employer to such fund during the succeeding taxable year.*

*"(e) WELFARE BENEFIT FUND.—For purposes of this section—*

*"(1) IN GENERAL.—The term 'welfare benefit fund' means any fund—*

*"(A) which is part of a plan of an employer, and*

*"(B) through which the employer provides welfare benefits to employees or their beneficiaries.*

*"(2) WELFARE BENEFIT.—The term 'welfare benefit' means any benefit other than a benefit with respect to which—*

*"(A) section 83(h) applies,*

*"(B) section 404 applies (determined without regard to section 404(b)(2)),*

*"(C) section 404A applies, or*

*"(D) an election under section 463 applies.*

*"(3) FUND.—The term 'fund' means—*

*"(A) any organization described in paragraph (7), (9), (17), or (20) of section 501(c),*

*"(B) any trust, corporation, or other organization not exempt from the tax imposed by this chapter, and*

*"(C) to the extent provided in regulations, any account held for an employer by any person.*

*"(f) METHOD OF CONTRIBUTIONS, ETC., HAVING THE EFFECT OF A PLAN.—If—*

*"(1) there is no plan, but*

*"(2) there is a method or arrangement of employer contributions or benefits which has the effect of a plan,*

*this section shall apply as if there were a plan.*

*"(g) EXTENSION TO PLANS FOR INDEPENDENT CONTRACTORS.—If any fund would be a welfare benefit fund (as modified by subsection (f)) but for the fact that there is no employee-employer relationship—*

*"(1) this section shall apply as if there were such a plan, and*

*"(2) any reference in this section to the employer shall be treated as a reference to the person for whom services are provided, and any reference in this section to an employee shall be treated as a reference to the person providing the services.*

***"Sec. 419A. QUALIFIED ASSET ACCOUNT; LIMITATION ON ADDITIONS TO ACCOUNT.***

*"(a) GENERAL RULE.—For purposes of this subpart, the term 'qualified asset account' means any account consisting of assets set aside to provide for the payment of—*

*"(1) disability benefits,*

*"(2) medical benefits,*

*"(3) SUB or severance pay benefits, or*

*"(4) life insurance benefit.*

*"(b) LIMITATION ON ADDITIONS TO ACCOUNT.—No addition to any qualified asset account may be taken into account under section 419(c)(1)(B) to the extent such addition results in the amount in such account exceeding the account limit.*

*"(c) ACCOUNT LIMIT.—For purposes of this section—*

*"(1) IN GENERAL.—Except as otherwise provided in this subsection, the account limit for any qualified asset account for any taxable year is the amount reasonably and actuarially necessary to fund—*

*"(A) claims incurred but unpaid (as of the close of such taxable year) for benefits referred to in subsection (a), and*

*"(B) administrative costs with respect to such claims.*

*"(2) ADDITIONAL RESERVE FOR POST-RETIREMENT MEDICAL AND LIFE INSURANCE BENEFITS.—The account limit for any taxable year may include a reserve funded over the working lives of the covered employees and actuarially determined on a level basis (using assumptions that are reasonable in the aggregate) as necessary for—*

*"(A) medical benefits provided for retired employees (determined on the basis of current medical costs), or*

*"(B) life insurance benefits provided to retired employees*

"(3) AMOUNT TAKEN INTO ACCOUNT FOR SUB OR SEVERENCE PAY BENEFITS.—

"(A) IN GENERAL.—The account limit for any taxable year with respect to SUB or severance pay benefits is 75 percent of the sum of—

"(i) the average annual qualified direct costs for SUB or severance pay benefits for any 2 of the immediately preceding 7 taxable years (as selected by the fund), and

"(ii) the average annual administrative costs during such 2 preceding taxable years allocable to SUB or severance pay benefits.

"(B) SPECIAL RULE FOR CERTAIN NEW PLANS.—In the case of any new plan for which SUB or severance pay benefits are not available to any key employee, the Secretary shall, by regulations, provide for an interim amount to be taken into account under paragraph (1).

"(4) LIMITATION ON AMOUNTS TO BE TAKEN INTO ACCOUNT.—

"(A) DISABILITY BENEFITS.—For purposes of paragraph (1), disability benefits payable to any individual shall not be taken into account to the extent such benefits are payable at an annual rate in excess of the lower of—

"(i) 75 percent of such individual's average compensation for his high 3 years (within the meaning of section 415(b)(3)), or

"(ii) the limitation in effect under section 415(b)(1)(A).

"(B) LIMITATION ON SUB OR SEVERANCE PAY BENEFITS.—For purposes of paragraph (3), any SUB or severance pay benefit payable to any individual shall not be taken into account to the extent such benefit is payable at an annual rate in excess of 150 percent of the limitation in effect under section 415(c)(1)(A).

"(5) SPECIAL LIMITATION WHERE NO ACTUARIAL CERTIFICATION.—

"(A) IN GENERAL.—Unless there is an actuarial certification of the account limit determined under paragraph (1) for any taxable year, the account limit for such taxable year shall not exceed the sum of the safe harbor limits for such taxable year.

"(B) SAFE HARBOR LIMITS.—

"(i) SHORT-TERM DISABILITY BENEFITS.—In the case of short-term disability benefits, the safe harbor limit for any taxable year is 17.5 percent of the sum of—

"(I) the qualified direct costs for the immediately preceding taxable year with respect to such benefits, and

"(II) the administrative costs for such preceding taxable year allocable to such benefits.

"(ii) MEDICAL BENEFITS.—In the case of medical benefits, the safe harbor limit for any taxable year is 35 percent of the sum of—

*"(I) the qualified direct costs for the immediately preceding taxable year with respect to medical benefits, and*

*"(II) the administrative costs for such preceding taxable year allocable to medical benefits.*

*"(iii) SUB OR SEVERANCE PAY BENEFITS.—In the case of SUB or severance pay benefits, the safe harbor limit for any taxable year is the amount determined under paragraph (3).*

*"(iv) LONG-TERM DISABILITY OR LIFE INSURANCE BENEFITS.—In the case of any long-term disability benefit or life insurance benefit, the safe harbor limit for any taxable year shall be the amount prescribed by regulations.*

*"(d) REQUIREMENT OF SEPARATE ACCOUNTS FOR POST-RETIREMENT MEDICAL OR LIFE INSURANCE BENEFITS PROVIDED TO KEY EMPLOYEES.—*

*"(1) IN GENERAL.—In the case of any employee who is a key employee—*

*"(A) a separate account shall be established for any medical benefits or life insurance benefits provided with respect to such employee after retirement, and*

*"(B) medical benefits and life insurance benefits provided with respect to such employee after retirement may only be paid from such separate account.*

*"(2) COORDINATION WITH SECTION 415.—For purposes of section 415, any amount attributable to medical benefits allocated to an account established under paragraph (1) shall be treated as an annual addition to a defined contribution plan for purposes of section 415(c).*

*"(3) KEY EMPLOYEE.—For purposes of this section, the term 'key employee' means any employee who, at any time during the plan year or any preceding plan year, is or was a key employee as defined in section 416(i).*

*"(e) SPECIAL LIMITATIONS ON RESERVES FOR MEDICAL BENEFITS OR LIFE INSURANCE BENEFITS PROVIDED TO RETIRED EMPLOYEES.—*

*"(1) BENEFITS MUST BE NONDISCRIMINATORY.—No reserve may be taken into account under subsection (c)(2) for medical benefits or life insurance benefits provided to retired employees unless the plan meets the requirements of section 505(b)(1) with respect to such benefits.*

*"(2) TAXABLE LIFE INSURANCE BENEFITS NOT TAKEN INTO ACCOUNT.—No life insurance benefit may be taken into account under subsection (c)(2) to the extent—*

*"(A) such benefit is includible in gross income under section 79, or*

*"(B) such benefit would be includible in gross income under section 101(b) (determined by substituting '$50,000' for '$5,000').*

*"(f) DEFINITIONS AND OTHER SPECIAL RULES.—For purposes of this section—*

*"(1) SUB OR SEVERANCE PAY BENEFIT.—The term 'SUB or severance pay benefit' means—*

*"(A) any supplemental unemployment compensation benefit (as defined in section 501(c)(17)(D)), and*

*"(B) any severance pay benefit.*

*"(2) MEDICAL BENEFIT.—The term 'medical benefit' means a benefit which consists of the providing (directly or through insurance) of medical care (as defined in section 213(d)).*

*"(3) LIFE INSURANCE BENEFIT.—The term 'life insurance benefit' includes any other death benefit.*

*"(4) VALUATION.—For purposes of this section, the amount of the qualified asset account shall be the value of the assets in such account (as determined under regulations).*

*"(5) HIGHER LIMIT IN CASE OF COLLECTIVELY BARGAINED PLANS.—Not later than July 1, 1985, the Secretary shall by regulations provide for special account limits in the case of any qualified asset account under a welfare benefit fund established under a collective bargaining agreement.*

*"(6) EXCEPTION FOR 10-OR-MORE EMPLOYER PLANS.—*

*"(A) IN GENERAL.—This subpart shall not apply in the case of any welfare benefit fund which is part of a 10 or more employer plan. The preceding sentence shall not apply to any plan which maintains experience-rating arrangements with respect to individual employers.*

*"(B) 10 OR MORE EMPLOYER PLAN.—For purposes of subparagraph (A), the term '10 or more employer plan' means a plan—*

*"(i) to which more than 1 employer contributes, and*

*"(ii) to which no employer normally contributes more than 10 percent of the total contributions contributed under the plan by all employers.*

*"(7) ADJUSTMENTS FOR EXISTING EXCESS RESERVES.—*

*"(A) INCREASE IN ACCOUNT LIMIT.—The account limit for any of the first 4 taxable years to which this section applies shall be increased by the applicable percentage of any existing excess reserves.*

*"(B) APPLICABLE PERCENTAGE.—For purposes of subparagraph (A)—*

| *"In the case of:* | *The applicable percentage is:* |
|---|---|
| *The first taxable year to which this section applies* | *80* |
| *The second taxable year to which this section applies* | *60* |
| *The third taxable year to which this section applies* | *40* |
| *The fourth taxable year to which this section applies* | *20* |

*"(C) EXISTING EXCESS RESERVE.—For purposes of this paragraph, the term 'existing excess reserve' means the excess (if any) of—*

*"(i) the amount of assets set aside for purposes described in subsection (a) as of the close of the first taxable year ending after the date of the enactment of the Tax Reform Act of 1984, over*

*"(ii) the account limit which would have applied under this section to such taxable year if this section had applied to such taxable year.*

*"(g) EMPLOYER TAXED ON INCOME OF WELFARE BENEFIT FUND IN CERTAIN CASES.—*

"(1) IN GENERAL —In the case of any welfare benefit fund which is not an organization described in paragraph (7) (9) (17), or (20) of section 501(c) the employer shall include in gross income for any taxable year an amount equal to such fund's deemed unrelated income for the fund's taxable year ending within the employer's taxable year

"(2) DEEMED UNRELATED INCOME —For purposes of paragraph (1), the deemed unrelated income of any welfare benefit fund referred to in paragraph (1) shall be the amount which would have been its unrelated business taxable income under section 512(a)(3) if such fund were an organization described in paragraph (7) (9), (17) or (20) of section 501(c)

"(h) AGGREGATION RULES —For purposes of this subpart—

"(1) AGGREGATION OF FUNDS —At the election of the employer 2 or more welfare benefit funds of such employer may be treated as 1 fund

"(2) TREATMENT OF RELATED EMPLOYERS —Rules similar to the rules of subsections (b) (c), (m) and (n) of section 414 shall apply

"(i) REGULATIONS —The Secretary shall prescribe such regulations as may be appropriate to carry out the purposes of this subpart Such regulations may provide that the plan administrator of any welfare benefit fund which is part of a plan to which more than 1 employer contributes shall submit such information to the employers contributing to the fund as may be necessary to enable the employers to comply with the provisions of this section "

(b) AMENDMENTS TO TAX ON UNRELATED BUSINESS INCOME —

(1) EXTENSION OF SECTION 512(A)(3) TO SUPPLEMENTAL UNEMPLOYMENT BENEFIT AND GROUP LEGAL TRUSTS —

(A) Paragraph (3) of section 512(a) (relating to special rules applicable to organizations described in section 501(c) (7) or (9)) is amended by striking out "section 501(c) (7) or (9)" each place it appears (including in the paragraph heading) and inserting in lieu thereof "paragraph (7), (9), (17) or (20) of section 501(c)"

(B) Clause (ii) of section 512(a)(3)(B) is amended by striking out "section 501(c)(9)" and inserting lieu thereof "paragraph (9), (17), or (20) of section 501(c)"

(2) LIMITATION ON DEDUCTION FOR SET ASIDE —Paragraph (3) of section 512(a) is amended by adding at the end thereof the following new subparagraph

"(E) LIMITATION ON AMOUNT OF SETASIDE IN THE CASE OF ORGANIZATIONS DESCRIBED IN PARAGRAPH (9), (17) OR (20) OF SECTION 501(C) —

"(i) IN GENERAL —In the case of any organization described in paragraph (9) (17) or (20) of section 501(c) a set aside for any purpose specified in clause (ii) of subparagraph (B) may be taken into account under subparagraph (B) only to the extent that such set aside does not result in an amount of assets set aside for such purpose in excess of the account limit determined under section 419A(c) for the taxable year (not taking into account any reserve for medical benefits provided to retired employees)

*"(ii) NO SET ASIDE FOR FACILITIES.—No set aside for assets used in the provision of benefits described in clause (ii) of subparagraph (B) shall be taken into account.*

*"(iii) TREATMENT OF EXISTING RESERVES FOR MEDICAL BENEFITS OR LIFE INSURANCE BENEFITS PROVIDED TO RETIRED EMPLOYEES.—*

*"(I) Clause (i) shall not apply to any income attributable to an existing reserve for medical or life insurance benefits for retired employees.*

*"(II) For purposes of subclause (I), the term 'existing reserve for medical benefits or life insurance benefits for retired employees' means the amount of assets set aside as of the close of the last plan year ending before the date of the enactment of the Tax Reform Act of 1984 for purposes of providing medical benefits or life insurance benefits to retired employees.*

*"(III) All payments during taxable years to which this subparagraph applies of medical benefits or life insurance benefits to retired employees shall be charged against the reserve referred to in subclause (II).*

*"(iv) TREATMENT OF TAX EXEMPT ORGANIZATIONS.—This paragraph shall not apply to any organization if substantially all of the contributions to such organization are made by employers who were exempt from tax under this chapter throughout the 5-taxable year period ending with the taxable year in which the contributions are made."*

*(c) TAX ON CERTAIN FUNDED WELFARE BENEFIT PLANS.—*

*(1) IN GENERAL.—Chapter 43 (relating to qualified pension, etc., plans) is amended by adding at the end thereof the following new section:*

***"SEC. 4976. TAXES WITH RESPECT TO FUNDED WELFARE BENEFIT PLANS.***

*"(a) GENERAL RULE.—If—*

*"(1) an employer maintains a welfare benefit fund, and*

*"(2) there is a disqualified benefit provided during any taxable year,*

*there is hereby imposed on such employer a tax equal to 100 percent of such disqualified benefit.*

*"(b) DISQUALIFIED BENEFIT.—For purposes of subsection (a), the term 'disqualified benefit' means—*

*"(1) any medical benefit or life insurance benefit provided with respect to a key employee other than from a separate account established for such owner under section 419A(d), and*

*"(2) any medical or life insurance benefit provided with respect to a retired employee unless the plan meets the requirements of section 505(b)(1) with respect to such benefit, and*

*"(3) any portion of such fund reverting to the benefit of the employer.*

"(c) DEFINITIONS.—For purposes of this section, the terms used in this section shall have the same respective meanings as when used in subpart D of part I of subchapter D of chapter 1."

(2) CONFORMING AMENDMENT.—The table of sections for chapter 43 (relating to qualified pension, etc., plans) is amended by adding at the end thereof the following new item:

"Sec. 4977. Taxes with respect to funded welfare benefit plans."

(d) CLERICAL AMENDMENT.—The table of subparts for part I of subchapter D of chapter 1 is amended by adding at the end thereof the following new item:

"Subpart D Treatment of welfare benefit funds "

(e) EFFECTIVE DATES.—

(1) IN GENERAL.—Except as otherwise provided in this subsection, the amendments made by this section shall apply to contributions paid or accrued after December 31, 1985, in taxable years ending after such date.

(2) SPECIAL RULE FOR COLLECTIVE BARGAINING AGREEMENTS.—In the case of plan maintained pursuant to 1 or more collective bargaining agreements—

(A) between employee representatives and 1 or more employers, and

(B) in effect on July 1, 1985 (or ratified on or before such date),

the amendments made by this section and section 514 shall not apply to years beginning before the date on which the last of the collective bargaining agreements relating to the plan terminates (determined without regard to any extension thereof agreed to after July 1, 1985).

(3) SPECIAL RULE FOR PARAGRAPH (2).—For purposes of paragraph (2), any plan amendment made pursuant to a collective bargaining agreement relating to the plan which amends the plan solely to conform to any requirement added by this section shall not be treated as a termination of such collective bargaining agreement.

(4) SPECIAL EFFECTIVE DATE FOR CONTRIBUTIONS OF FACILITIES.—Notwithstanding paragraphs (1) and (2), the amendments made by this section shall apply in the case of—

(A) any contribution after June 22, 1984, of a facility to a welfare benefit fund, and

(B) any other contribution after June 22, 1984, to a welfare benefit fund to be used to acquire a facility.

(5) BINDING CONTRACT EXCEPTION TO PARAGRAPH (4).—Paragraph (4) shall not apply to any facility—

(A) which is acquired pursuant to a binding contract in effect on June 22, 1984, and at all times thereafter, or

(B) any facility the construction of which began before June 22, 1984.

SEC. 512. TREATMENT OF UNFUNDED DEFERRED BENEFITS.

(a) GENERAL RULE.—Subsection (b) of section 404 (relating to method of contributions, etc., having the effect of a plan) is amended to read as follows:

"(b) METHOD OF CONTRIBUTIONS, ETC., HAVING THE EFFECT OF A PLAN; UNFUNDED DEFERRED BENEFITS.—

*"(1) METHOD OF CONTRIBUTIONS, ETC., HAVING THE EFFECT OF A PLAN.—If—*

*"(A) there is no plan, but*

*"(B) there is a method or arrangement of employer contributions or compensation which has the effect of a stock bonus, pension, profit-sharing, or annuity plan, or other plan deferring the receipt of compensation (including a plan described in paragraph (2)),*

*subsection (a) shall apply if there were such a plan.*

*"(2) PLANS PROVIDING UNFUNDED DEFERRED BENEFITS.—*

*"(A) IN GENERAL.—For purposes of this section, any plan providing for deferred benefits (other than compensation) for employees, their spouses, or their dependents shall be treated as a plan deferring the receipt of compensation. In the case of such a plan, for purposes of this section, the determination of when an amount is includible in gross income shall be made without regard to any provisions of this chapter excluding such benefits from gross income.*

*"(B) EXCEPTION FOR CERTAIN BENEFITS.—Subparagraph (A) shall not apply to—*

*"(i) any benefit provided through a welfare benefit fund (as defined in section 419(e)), or*

*"(ii) to any benefit with respect to which an election under section 463 applies."*

*(b) CROSS REFERENCE.—Subsection (j) of section 162 (relating to cross references) is amended by adding at the end thereof the following new paragraph:*

*"(3) For special rules relating to—*

*"(A) funded welfare benefit plans, see section 419, and*

*"(B) deferred compensation and other deferred benefits, see section 404."*

*(c) EFFECTIVE DATE.—*

*(1) IN GENERAL.—Except as provided in paragraph (2), the amendments made by this section shall apply to amounts paid or incurred after the date of the enactment of this Act in taxable years ending after such date.*

*(2) EXCEPTION FOR CERTAIN EXTENDED VACATION PAY PLANS.—In the case of any extended vacation pay plan maintained pursuant to a collective bargaining agreement—*

*(A) between employee representatives and 1 or more employers, and*

*(B) in effect on June 22, 1984,*

*the amendments made by this section shall not apply before the date on which such collective bargaining agreement terminates (determined without regard to any extension thereof agreed to after June 22, 1984). For purposes of the preceding sentence, any plan amendment made pursuant to a collective bargaining agreement relating to the plan which amends the plan solely to conform to any requirement added by this section shall not be treated as a termination of such collective bargaining agreement.*

*"(3) APPLICATION OF SUBSECTION WHERE OTHER NONDISCRIMINATION RULES PROVIDED.—In the case of any benefit for which a provision of this chapter other than this subsection provides nondiscrimination rules, paragraph (1) shall not apply but the requirements of this subsection shall be met only if the nondiscrimination rules so provided are satisfied with respect to such benefit.*

*"(4) AGGREGATION RULES.—For purposes of this subsection—*

*"(A) AGGREGATION OF PLANS.—At the election of the employer, 2 or more plans of such employer may be treated as 1 plan.*

*"(B) TREATMENT OF RELATED EMPLOYERS.—Rules similar to the rules of subsections (b), (c), (m), and (n) of section 414 shall apply. For purposes of the preceding sentence, section 414(n) shall be applied without regard to paragraph (5).*

*"(5) HIGHLY COMPENSATED INDIVIDUAL.—For purposes of this subsection, the term 'highly compensated individual' has the meaning given such term by section 105(h)(5). For purposes of the preceding sentence, section 105(h)(5) shall be applied by substituting '10 percent' for '25 percent'.*

*"(c) REQUIREMENT THAT ORGANIZATION NOTIFY SECRETARY THAT IT IS APPLYING FOR TAX-EXEMPT STATUS.—*

*"(1) IN GENERAL.—An organization shall not be treated as an organization described in paragraph (9), (17), or (20) of section 501(c)—*

*"(A) unless it has given notice to the Secretary, in such manner as the Secretary may by regulations prescribe, that it is applying for recognition of such status, or*

*"(B) for any period before the giving of such notice, if such notice is given after the time prescribed by the Secretary by regulations for giving notice under this subsection.*

*"(2) SPECIAL RULE FOR EXISTING ORGANIZATIONS.—In the case of any organization in existence on the date of the enactment of the Tax Reform Act of 1984, the time for giving notice under paragraph (1) shall not expire before the date 1 year after such date of the enactment."*

*(b) CLERICAL AMENDMENT.—The table of sections for part I of subchapter F of chapter 1 is amended by adding at the end thereof the following new item:*

*"Sec 505. Additional requirements for organizations described in paragraph (9), (17), or (20) of section 501(c) "*

*(c) EFFECTIVE DATE.—*

*(1) IN GENERAL.—The amendments made by this section shall apply to years beginning after December 31, 1984.*

*(2) TREATMENT OF CERTAIN BENEFITS IN PAY STATUS AS OF JANUARY 1, 1985.—For purposes of determining whether a plan meets the requirements of section 505(b) of the Internal Revenue Code of 1954 (as added by subsection (a)), there may (at the election of the employer) be excluded from consideration all disability or severance payments payable to individuals who are in pay status as of January 1, 1985. The preceding sentence shall not apply to any payment to the extent such payment is increased by any plan amendment adopted after June 22, 1984.*

index" means the Consumer Price Index (all items—United States city average) published monthly by the Bureau of Labor Statistics.

Nothing in this conference agreement is intended to limit benefits that are otherwise available to any individual under the provisions of the modified final judgment (including the divesture interchange agreement), under applicable law, or otherwise. This includes, but is not limited to, rights under the Communications Act of 1934, as amended, and the Employee Retirement Income Security Act of 1974 (ERISA), as amended. A person alleging a violation of this legislation may seek redress under the Communications Act of 1934 (which governs communications common carriers), under applicable labor and pension statutes, or at common law.

The conference agreement does not follow the Senate amendment with respect to the limits on contributions and benefits under sec. 415. It is the understanding of the conferees that present law provides for the aggregation of contributions and benefits under plans maintained by separate employers for purposes of the overall limits on contributions and benefits in situations in which prior service with another employer is recognized by the employer.

## B. Welfare Benefit Plans

### 1. Deductions for contributions to funded benefit plans

*Present law*

An employer's contribution to a fund that is a part of a welfare benefit plan may be deductible in the year it is made rather than at the time the benefit is provided. Deductions for employer contributions to a nonqualified deferred compensation plan are generally not allowed until an amount is includible in the gross income of the employee.

*House bill*

The House bill generally limits employer deductions for a contribution to a VEBA, SUB to the amount that would be deductible by a cash-method taxpayer for a payment under an unfunded plan. An additional deduction is allowed for an addition to a funded reserve. Generally, the reserve is limited to 75 percent of insurance-type benefits provided by the plan during the current year and the preceding year. A transitional rule is provided for pre-enactment accumulations.

The House bill would generally apply to contributions paid or accrued after March 31, 1984 in taxable years ending after that date. The bill provides a delayed effective date for collectively bargained plans.

*Senate amendment*

No provision.

*Conference agreement*

#### a. Contributions to funded welfare benefit plans

The conference agreement generally follows the House bill, with modifications. In general, deductions for contributions to a welfare

benefit fund are limited to qualified costs, which is the sum of (i) qualified direct costs, and (ii) additions, within limits, to a qualified asset account. Several changes are made to the definitions of qualified direct cost and welfare benefit and substantial modifications are made to the allowable limit on a qualified asset account.

*Child care facilities.*—Under the conference agreement, in determining qualified direct costs with respect to a child care facility held by a fund, the adjusted basis of the facility is treated as deductible ratably over a period of 60 months. A child care facility is tangible property of a character subject to depreciation and located in the United States, and must be a child care center primarily for children of the employees of the employer. As under the House bill, qualified direct costs with respect to other capital expenditures are those which would be allowed under the usual Code rules which would be applied if the employer owned the asset.

*Definition of welfare benefit fund.*—In general, this section of the bill applies to contributions to welfare benefit funds which are organizations, reserves or accounts held by organizations, through which an employer provides welfare benefits to employees or their beneficiaries. In prescribing regulations relating to the definition of the term "fund," the conferees wish to emphasize that the principal purpose of this provision of the bill is to prevent employers from taking premature deductions, for expenses which have not yet been incurred, by interposing an intermediary organization which holds assets which are used to provide benefits to the employees of the employer. Thus, a retired life reserve or premium stabilization account ordinarily is to be considered a fund or part of a fund, since such an account is maintained for an individual employer and that employer has a determinable right to have the amount in such an account applied against that employer's future costs of benefit claims or insurance premiums. A similar situation exists with respect to premium arrangements, under which an employer may, in some cases, pay an insurance company more in a year than the benefit costs incurred in that year and the employer has an unconditional right in a later year to a refund or credit of the excess of payments over benefit costs. In contrast, an ordinary disability income policy under which an employer pays a premium so that employees who become disabled in that year may collect benefit payments for the duration of disability is not a fund, since the employer has no right to recover any part of the premium payment and the future benefit payments to an employee whose disability occurs during the period for which the premium is paid is not contingent on any further payments by the employer. While in many cases welfare benefit funds are designed to function in a manner similar to insurance arrangements, the conference is concerned that there are no clear standards or limitations applicable to such funds that prevent their utilization for substantial nonqualified deferred compensation funding outside the general pension plan funding, accrual and vesting rules.

*Limitations on qualified asset account.*—The conference agreement includes substantial modifications to the provisions setting forth the limitation on additions to a qualified asset account. Such an account consists of assets set aside for the payment of disability

benefits, medical benefits, supplemental unemployment or severance pay benefits, and life insurance or death benefits.

In general, the account limit is the amount estimated to be necessary under actuarial assumptions that are reasonable in the aggregate, to fund the liabilities of the plan for the amount of claims incurred but unpaid, for benefits described in the previous paragraph and administrative costs of such benefits, as of the close of the taxable year. Claims are incurred only when an event entitling the employee to benefits, such as a medical expense, a separation, a disability, or a death actually occurs. The allowable reserve includes amounts for claims estimated to have been incurred but which have not yet been reported, as well as those claims which have been reported but have not yet been paid. An example of an incurred but unpaid claim is the occurrence of the death of an employee during the year under a plan that provides for payments to a survivor of the employee for the survivor's remaining life. Under the conference agreement, the qualified asset account may include the estimated present value of the future stream of benefits payable to this survivor, using reasonable assumptions as to earnings of the fund and mortality experience.

With respect to disability benefits, the conferees expect that Treasury regulations will provide more specific guidance as to the time at which claims are incurred. It is the intention of the conferees that a disability is to be defined as any serious physical or mental impairment which causes an inability to perform a substantial portion of the duties of an individual's ordinary employment. The conferees intend that funding of claims with respect to an indefinite period of time is to be allowed only in connection with disabilities which are determined to be long-term disabilities. Such disabilities are those which (1) a medical evaluation determines is expected to last for more than 12 months and (2) has persisted for at least 5 months. With respect to such disabilities, current deductions are to be allowed for contributions necessary to fund the expected future stream of benefit payments using reasonable assumptions as to morbidity, mortality, and fund earnings. Other disabilities which have persisted for at least 2 weeks are to be considered short-term disabilities; no more than 5 months of benefit payments may be deemed to have been incurred with respect to short-term disabilities.

In general, in addition to requiring that actuarial assumptions are to be reasonable in the aggregate, Treasury regulations may prescribe specific interest rate and mortality assumptions to be used in all actuarial calculations. Such assumptions are to be consistent with requirements provided elsewhere in conference agreement for the computation of tax reserves held by life insurance companies.

*Limitation on disability, or SUB, or severance benefits taken into account.*—In the case of any disability benefit, a reserve may not be established with respect to a benefit payment in excess of the lesser of the limit for the year on an annual benefit under a qualified defined benefit pension plan ($90,000 for 1984) or 75 percent of a disabled employee's annual compensation from the employer.

With respect to supplemental unemployment compensation benefits (SUB) and severance pay benefits the portion of an annual ben-

efit in excess of 1.5 times the limit on contributions under a qualified defined contribution plan ($45,000 for 1984) for any employee is not to be taken into account in determining the limit.

*Prefunding of life insurance, death benefits, or medical benefits for retirees.*—The qualified asset account limits allow amounts reasonably necessary to accumulate reserves under a welfare benefit plan so that the medical benefit or life insurance (including death benefit) payable to a retired employee during retirement is fully funded upon retirement. These amounts may be accumulated no more rapidly than on a level basis over the working life of the employee, with the employer of each employee. Each year's computation of contributions with respect to retiree medical benefits is limited to the use of assumptions that the medical benefits provided to retirees in the future will have the same cost as medical benefits currently provided to retirees (projected inflation is not to be taken into account). Of course, no advance deduction is to be allowed with regard to a plan which provided medical or life insurance benefits exclusively for retirees, since such a plan would be considered a deferred compensation plan subject to the rules of section 404 rather than the provision applicable to funded welfare benefit plans. The conferees intend that the Treasury Department prescribe rules requiring that the funding of retiree benefits be based on reasonable and consistently applied actuarial cost methods, which take into account experience gains and losses, changes in assumptions, and other similar items, and be no more rapid than on a level basis over the remaining working lifetimes of the current participants (reduced on the basis of reasonable turnover and mortality assumptions).

Further, contributions for any employee who is a key employee are required to be accounted for separately by a welfare benefit fund. The separate account is to include amounts contributed to the plan with respect to any service after the employee becomes a key employee as well as a reasonable allocation (determined under Treasury regulations) of amounts contributed to the fund on account of the employee before key employee status was attained. Medical and life insurance benefits with respect to such an employee may be only from such account. In addition, in the case of a key employee, the conference agreement provides that post-retirement medical benefits are to be taken into account in applying the limitations on contributions and benefits under qualified plans (sec. 415) under principles similar to those applicable to post-retirement medical benefits provided by qualified pension plans.

In addition, under the conference agreement, if the life insurance or medical coverage provided by a plan discriminates in favor of employees who are officers, shareholders, or highly compensated, then the limit on the qualified asset account may not take account of contributions to provide such coverage.

Finally, the amount of life insurance or death benefit that may be taken into account with respect to prefunding of retiree benefits of any employee is not to exceed the amount of the insurance that may be provided to the employee tax-free under section 79. This amount generally is limited to $50,000 but the $50,000 limit may not apply in the case of certain grandfathered employees defined

by amendments to section 79 elsewhere in the conference agreement.

*SUB and severance pay reserve.*—The conference agreement provides an additional reserve for SUB and severance pay benefits equal to 75 percent of the sum of (a) the average annual qualified direct cost of such benefits provided and (b) the administrative costs, during any 2 of the immediately preceding 7 years. Such benefits may include medical or other benefit payable to severed or unemployed workers. The agreement also authorizes Treasury regulations under which an interim limit is to be provided in the case of a new SUB or severance pay plan. The interim reserve is not available, under the agreement, in the case of a plan that provides SUB or severance benefits for any employee who is a key employee.

*Safe-harbor.*—The conference agreement provides that an actuarial certification by a qualified actuary (determined under Treasury regulations) justifying the taxpayer's reserve computations is not necessary if the amount in the qualified asset account is below a prescribed safe harbor, equal to the sum of separate safe harbor amounts computed with respect to each benefit. For short-term disability benefits, the safe harbor amount is 17.5 percent of benefit costs plus administrative costs in the prior taxable year; for medical benefits, the safe harbor amount is 35 percent of prior year medical benefits and allocable administrative costs. For SUB or severance benefits, the safe harbor amount is the additional reserve described above. Safe harbor amounts for long-term disability, life insurance and retiree medical benefits may be prescribed by Treasury regulations. For any safe harbor limitation based on prior plan costs, insurance premiums may not be taken into account, because the conferees do not intend that a fund is to be used as a vehicle for prepayment of insurance premiums for current benefits. Even if the safe harbors are satisfied, the taxpayer is to show that the reserves, as allowed under the general standards provided by the bill (e.g., claims incurred but unpaid) are reasonable.

*Certain collectively bargained plans.*—By July 1, 1985, the Treasury Department is to publish final regulations establishing special reserve limit principles with respect to welfare benefit funds maintained pursuant to an agreement that the Secretary of Labor finds to be a collective bargaining agreement between employee representatives and one or more employers, if there is evidence of good faith bargaining over the benefits provided by the plan between the employee representatives and the employer (or employers).

In establishing these limits, the Treasury is to presume that reserves in such plans are not excessive because of the arm's length negotiations between adversary parties inherent in the collective bargaining process. Because contributions under such plans are often made on the basis of a defined contribution fixed over a multiyear period on the basis of economic assumptions which prove to be incorrect and because such contributions may be the only source of benefits to be provided during layoffs, strikes, lockouts, and economic recession, these special limits are to allow substantial flexibility in determining the application of these provisions with respect to such plans.

*Transitional rule.*—Under the conference agreement, in the case of a plan that was in existence on June 22, 1984, special rules are provided for the determination of the limit for each of the first four years to which the provision applies. In particular, the agreement provides that for the first year, the limit for the year is to be the sum of (1) the limit determined without regard to the transitional rule, and (2) 80 percent of the excess reserve amount. The excess reserve amount for any year is the excess of the reserve as of the end of the first plan year ending after the date of enactment over the limit determined without regard to the transitional rule. For the second, third, and fourth succeeding years, 60, 40, and 20 percent, respectively, of the excess reserve amount for such years is to be added to the limit determined under the usual rules.

*Elective aggregation.*—Under the conference agreement, an employer may elect to aggregate plans and funds in applying the deduction limits and the rules prohibiting discrimination in favor of certain employees. The agreement provides, however, that the election to aggregate must be consistent for deduction and discrimination purposes. For example, if an employer elects to aggregate 2 plans for deduction purposes, those 2 plans must be aggregated for discrimination purposes.

*10 or more employer plans.*—For a plan year in which no employer (or employers related to an employer) are required to contribute more than 10 percent of the total contributions, the conference agreement provides that the deduction limits do not apply. The exclusion is provided because under such a plan, the relationship of a participating employer to the plan often is similar to the relationship of an insured to an insurer. The agreement authorizes Treasury regulation under which the percentage may be increased in appropriate cases. For example, a higher percentage could be appropriate in the case of a plan maintained by employers in the construction industry if unusual building activity in the geographic area covered by the plan causes temporary and unusual distortions in the contribution pattern under the plan.

The agreement provides, however, that notwithstanding compliance with the 10-percent rule, and consistent with the discussion above on definition of a fund, a plan is not exempt from the deduction limits if the liability of any employer who maintains the plan is determined on the basis of experience rating because the employer's interest with respect to such a plan is more similar to the relationship of an employer to a fund than an insured to an insurer.

*Effective date.*—These provisions generally apply to contributions paid or accrued after December 31, 1985. However, in the case of a plan maintained under a collective bargaining contract in effect on July 1, 1985, or ratified before that date, the provisions do not apply until the termination of the contract, determined without regard to any contract extension agreed to after that date.

In addition, these provisions apply to any contribution of a facility to a welfare benefit fund after June 22, 1984, so that deductions with respect to this contribution are to be determined under usual Code rules applicable to recovery of the cost of assets (but taking account of the special rule for child care facilities described above). Further, these rules apply to other contributions, such as cash, made after that date which are to be used to acquire a facility, so

that later acquisition of facility with the use of such funds will limit the deduction for the original contribution. This rule does not apply for any facility acquired under a binding contract in effect on and at all times after that date or any facility under construction on June 22, 1984.

**b. Unfunded deferred benefits**

The conference agreement follows the House bill, with two modifications. First, the agreement provides that any vacation benefit to which an election applies under section 463 is not to be considered a deferred benefit subject to the rules of section 404. Second, the bill provides that that provision generally is effective for amounts paid or incurred after the date of enactment. However, in the case of an extended vacation pay plan in effect on June 22, 1984 and maintained under a collective bargaining agreement, the provision is not effective until the agreement terminates (without regard to any extension agreed to after June 22, 1984). An extended vacation pay plan is one under which employees gradually over a period of years earn the right to additional vacation which cannot be taken until the end of this period. Such a plan is a deferred benefit plan, which under the conference agreement is subject to the deduction-timing rules of section 404.

However, the conferees intend that payment of bonuses or other amounts within 2½ months after the close of the taxable year in which significant services required for payment have been performed is not to be considered a deferred compensation or deferred benefit plan. The conferees also intend that the reference in the House bill to deferred compensation arrangements under section 404(b) includes all compensation, fee, and similar payments, however denominated, except those which are specifically exempted.

**2. Excise taxes on funded benefit plans**

*Present law*

No provision.

*House bill*

No provision.

*Senate amendment*

Under the Senate amendment, an excise tax is imposed on an employer who maintains a top heavy funded welfare benefit plan with an excess reserve. The tax is equal to the sum of (1) for each year in which an excess arose, the product of the addition to the excess and the highest corporate income tax rate in effect for the current year, and (2) a tax equal to interest on that amount from the time the excess arose to the current year.

The Senate amendment defines excess reserves for a year as reserves in excess of the reserve limit. The reserve limit for a year is the sum of (1) 3 times the average annual benefits paid by the fund during the current year and the preceding year for total and permanent disability, and (2) ⅓ of the average annual benefits paid by

the fund during that period for medical care, severance pay, and supplemental unemployment compensation.

Under the Senate amendment, a fund is generally top heavy for a year if more than 50 percent of any class of its benefits are provided to key employees. Special rules are provided for educational benefits and in the case of a benefit that consists of the use of a facility, top heavy use of the facility would result in excise taxes on the employer and on key employees. Benefits provided by a top heavy fund to a key employee are subject to an excise tax imposed at the highest individual income tax rate for the year.

The Senate amendment defines a key employee as (a) an owner of more than 5 percent of the employer, (b) an officer of the employer, or (c) a member of the family of a key employee. Key employee status is permanent under the Senate amendment.

The Senate amendment applies to years beginning after December 31, 1984.

*Conference agreement*

Under the conference agreement, an excise tax is imposed with respect to disqualified benefits provided by a fund under a welfare benefit plan. The tax is equal to 100 percent of the disqualified benefits provided during a taxable year and is imposed on the employer who maintains the fund.

Under the agreement, a disqualified benefit is (1) (any medical benefit or life insurance benefit provided with respect to a key employee (sec. 416(i)) other than from a separate account established for that employee under the new rules relating to deductions under funded welfare benefit plans (sec. 419(A)(d)), (2) any medical or life insurance benefit provided with respect to a retired employee unless the benefit is provided from a fund that meets the additional requirements for tax exempt status provided by the agreement (sec. 505(b)(1)), and (3) any portion of the fund reverting to the benefit of the employer.

The amount to be charged against a key employee's account is to be determined under Treasury regulations. The conferees intend that these regulations will provide for the computation of this amount on the basis of the key employee's allocable share of the cost of providing the benefit for the year to all covered employees.

This provision is effective under the same rules applicable to the provisions relating to deductions for plan contributions.

**3. Tax treatment of exempt benefit organizations**

*Present law*

The income of certain tax-exempt organizations, including a supplemental unemployment compensation benefit trust (SUB) and a group legal service organization (GLSO) generally is not subject to income tax. However, a tax applies to the unrelated business income of such an organization. In addition, the other income of a voluntary employees' beneficiary association (VEBA) is subject to the tax on unrelated business income to the extent it is not set aside for an exempt purpose. No specific limit is provided on the amount that may be set aside for an exempt purpose.

No part of the net earnings of a tax-exempt VEBA may inure to the benefit of any private shareholder or individual other than through the payment of permissible benefits. Under Treasury Regulations, a VEBA violates this standard if it does not meet rules prohibiting discrimination in favor of employees who are officers, shareholders, or highly compensated. The eligibility criteria for VEBA membership and benefits under a VEBA may not be established or administered in a manner that limits membership or benefits to officers, etc., or entitles them to benefits that are disproportionate to benefits for other employees. A tax-exempt VEBA is required to benefit at least 2 employees.

Under present law, an organization or trust created or organized exclusively to form part of a group legal services plan (within the meaning of sec. 120) may be entitled to tax exemption.

*House bill*

*Unrelated business income tax.*—The income of a VEBA, SUB, or GLSO for a year is subject to the tax on unrelated business income to the extent that benefit plan reserves for the year exceed the reserve limit.

*Benefits for certain employees.*—A VEBA, SUB, or GLSO is not tax exempt if more than 25 percent of any class of benefits it provides is provided to an individual who (a) is one of the 5 highest paid officers, (b) owns more than 10 percent of the value of the employer, or (c) is one of the 10 percent highest paid employees. The provision does not apply to a collectively bargained plan.

*Discrimination.*—A VEBA, SUB, or GLSO is not tax exempt if any class of benefits discriminates in favor of highly compensated employees. The new nondiscrimination standard does not apply to a class of benefits for which a nondiscrimination standard is otherwise provided by the Code. The provision does not apply to a collectively bargained plan.

*Reporting requirements.*—A VEBA, SUB, or GLSO is not tax exempt unless it notifies the IRS of its claim to tax exempt status.

*Effective date.*—The provision applies to taxable years beginning after December 31, 1984.

*Senate amendment*

*Unrelated business income tax.*—No provision.

*Benefits for certain employees.*—Similar to the House bill except that the limit is applied to benefits provided to key employees. Under the Senate amendment, the following are key employees permanently: (1) an owner of more than 5 percent of the employer, (2) an officer of the employer, or (3) a member of the family of a key employee. The provision does not apply to a multiemployer plan.

*Discrimination.*—Same as the House bill except that if the Code provides standards under which a class of VEBA, SUB, or GLSO benefits is excludible from gross income, then the nondiscrimination rules of the Senate amendment are met only if those standards are satisfied. The provision does not apply to a multiemployer plan.

*Reporting requirements.*—An employer who maintains a VEBA, SUB, or GLSO is required to report on whether the organization

meets the nondiscrimination and concentration of benefits standards.

*Effective date.*—Same as the House bill.

*Conference agreement*

*Unrelated Business Income.*—Under the conference agreement, the special rules applicable to voluntary employees' beneficiary associations (VEBAs) and social clubs for purposes of the tax on unrelated business taxable income are extended to supplemental unemployment compensation benefit trusts (SUBs) and group legal service organizations (GLSOs). In addition, under the agreement, more specific limits are provided with respect to the amount that may be set aside for exempt purposes by such an organization.

Under the agreement, in the case of a VEBA, etc., the amount set aside for an exempt purpose is generally not to exceed the qualified asset account limit (sec. 419A(c)) for the taxable year (without taking into account any reserve for medical benefits provided to retired employees). In addition, the amount set aside for exempt purposes is not to include any facility used to provide recreational and other certain other benefits. The limit on the set-aside applies to more-than-10-employer VEBAs which are exempt from the deduction limitations.

The agreement provides a transitional rule for existing reserves to provide medical benefits and life insurance benefits to retired employees. Under the agreement, the income attributable to an existing reserve is not subject to the new rules for calculating unrelated business taxable income. The agreement provides that an existing reserve is the amount of assets set aside as of the close of the last plan year ending before the date of the enactment of the bill for purposes of providing such benefits. The transition relief applies to a reserve to provide such benefits only to the extent the reserve does not exceed the amount that could be accumulated under the principles of Rev. Ruls. 69-382, 1969 C.B. 28, and 73-599, 1973-2 C.B. 40. All future payments of medical or life insurance benefits to retirees under plans of the employer are to be charged against the reserve to which the transition rule applies.

The new rules for calculating unrelated business taxable income are not to apply to any organization if substantially all of the contributions to the organization are made by employers who were exempt from income tax throughout the 5-taxable year period ending with the taxable year in which the contributions are made.

The agreement also provides for a tax on an employer who maintains a welfare benefit fund that is not exempt from income tax. Under the agreement, in the case of any welfare benefit fund, such as a retired life reserve account, that is not exempt from income tax as a social club, VEBA, SUB, or GLSO, the employer who maintains the fund is to include in gross income for the taxable year an amount equal to the deemed unrelated income of the fund. The agreement provides that deemed unrelated income of such a welfare benefit fund is the amount that would be unrelated business taxable income of the fund if it were a tax exempt social club, VEBA, SUB, or GLSO. In determining deemed unrelated income, at the election of the employer, 2 or more non-exempt welfare benefit funds of the employer may be treated as a single fund. Also,

under the rules relating to deemed unrelated income, the aggregation rules applicable to qualified pension plans are to apply.

This provision is effective under the same rules applicable to the provisions relating to deductions for plan contributions.

*Benefits for Certain Employees.*—The conference agreement does not contain the provisions of the House bill on the Senate amendment.

*Discrimination.*—The conference agreement generally follows the provisions of the House bill establishing new nondiscrimination standards for a tax-exempt voluntary employees' beneficiary association (VEBA), or group legal services organization (GLSO). With respect to the nondiscrimination rules, certain employees who are not covered by a plan may be excluded from consideration in applying the nondiscrimination standards. These employees are employees who have not attained the age of 21, employees who have not completed 3 years of service with the employer, less than ½-time employees, employees who are included in certain collective bargaining units, and certain nonresident aliens.

The conferees wish to clarify the rules of the House bill relating to integration of benefits under a VEBA with social security. In testing whether a disability plan funded with an exempt trust violates the rules forbidding discrimination in favor of employees who are officers, shareholders, or highly compensated, a part of each employee's Social Security benefit (the part considered to be paid for by the employer) can be taken into account as if it were provided under the employer's plan. Similar integration rules are provided for qualified pension plans.

For example, a pension plan may provide a retirement benefit that is reduced by up to 83⅓ of the primary insurance amount for the employee under Social Security. This 83⅓ percent offset represents the part of the employee's Social Security benefit that the employer is considered to have provided. It includes the value of the employer's Disability Income (DI) contribution, as well as his Old-Age and Survivor's Insurance (OASI) contribution. The Disability Income benefit is considered to make up 10 percent of the value of employer-provided Social Security benefits. Thus, if the employer provides a disability benefit under the pension plan and the disability benefit is reduced by 100 percent of the Social Security benefit, then the employer may "take credit" for only 90 percent of employer-provided Social Security benefits when paying a retirement benefit. Accordingly, only 75 percent (90 percent of 83⅓) of Social Security benefits could be subtracted from the retirement benefit.

Thus, under the agreement, if an employer's pension plan is not more than 90 percent integrated—that is, it does not reduce benefits by more than 90 percent of the amount by which they could be reduced (e.g., by more than 75 percent of social security benefits)—then double integration does not occur. In this case, the agreement requires no change in either the pension plan or the disability plan.

On the other hand, if an employer's pension plan is more than 90 percent integrated, the full value of the Disability Income benefit under Social Security could not be used to reduce long-term disability benefits under the employer's plan. For example, if the pension plan is 93 percent integrated (so that 30 percent of the employer's

Social Security Disability Income benefit has been used by the pension plan), then no more than 70 percent of the Disability Income benefit could be applied to reduce long-term disability benefits under the employer's plan. Of course, if the pension plan were 100 percent integrated, the long-term disability benefit under the employer's plan could not be integrated with Social Security. The rules relating to integration of long-term disability benefits apply to benefits funded by employer contributions as well as benefits funded by employee contributions.

Of course, the agreement also permits the integration of long-term disability benefits with workers' compensation benefits.

In addition, the agreement does not affect the integration of long-term disability benefits for employees who are disabled before the effective date.

*Effective date.*—The conference agreement follows the House bill.

*Reporting Requirements.*—The conference agreement follows the House bill.

*Studies.*—Under the conference agreement, the Secretary of the Treasury is directed to study the possible means of providing for minimum standards for employee participation, vesting, accrual, and funding under welfare benefit plans for current and retired employees (including separated employees). The study is to include a review of whether the funding of welfare benefits is adequate, inadequate, or excessive. The Secretary is to report to the Congress with respect to the study by February 1, 1985. The conferees expect that the Secretary will provide suggestions for minimum standards where appropriate.

**4. Employer and welfare benefit fund treated as related persons**

*Present law*

Under present law, the gain from the sale of depreciable property between certain related taxpayers is treated as ordinary income but an employer and a welfare benefit fund to which the employer contributes are not generally treated as related parties.

*House bill*

The House bill treats an employer and a welfare benefit fund as related parties if the employer controls the fund directly or indirectly.

The provision applies to sales and exchanges after the date of enactment, in taxable years ending after that date.

*Senate amendment*

The Senate amendment is the same as House bill except that the provision applies to a welfare benefit fund whether or not the fund is exempt from tax.

*Conference agreement*

The conference agreement follows the Senate amendment.